838 So.2d 729 (2003)
STATE of Louisiana
v.
Michael TAYLOR.
No. 2001-KA-1638.
Supreme Court of Louisiana.
January 14, 2003.
Rehearing Denied March 21, 2003.
*736 Carol A. Kolinchak, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Don M. Burkett, District Attorney, Helene M. Sugar, Counsel for Respondent.
TRAYLOR, J.
On January 27, 1999, a DeSoto Parish grand jury indicted Michael Taylor, defendant herein, for the first degree murder of Chester Howell, in violation of R.S. 14:30. After a trial by jury, defendant was found guilty as charged on July 16, 2000, and was sentenced to death. Defendant now directly appeals his conviction and sentence, raising nineteen assignments of error, variously combined into sixteen arguments.[1]

FACTS
On January 7, 1999, at approximately 2:30 p.m., Brenda Green heard a gunshot while driving on Missile Base Road in DeSoto Parish. She then observed two young white males standing on a bridge before they fled in a white sports car, leaving behind the body of Chester Howell. Ms. Green immediately drove to a nearby body shop and called 911. The victim was pronounced dead shortly thereafter with three gunshot wounds to his arm, chest, and lower back.
Investigating officers learned the victim's identity from identification in his wallet which also included business cards from the Morgan Pontiac car dealership. Later, the police further learned that earlier in the day two young white males arrived on foot at the dealership and requested to test drive a white Pontiac Firebird. The victim accompanied the two men on the test drive, but never returned. A description of the vehicle was subsequently broadcast by the police.
The next day, Sergeant Morris, an officer with the DeSoto Parish Sheriff's Department, received a call from the Missouri State Police indicating the stolen vehicle had been found abandoned after two young white males committed a bank robbery in Lamoni, Iowa, and then engaged in a high speed chase which resulted in the non-fatal shooting of the Lamoni police chief. Footprints left in the snow near the vehicle led police to a burglarized body shop which was also missing a service truck. Five days later, officers found a Winchester Model .22 caliber rifle and a Ruger Super Blackhawk Model.44 magnum handgun near the abandoned Firebird. The guns matched the description of the weapons used in the bank robbery. Through DNA testing, three cigarette butts recovered from the Firebird were matched to defendant. In addition, two fingerprints lifted from the vehicle were matched to defendant. Shortly thereafter, the stolen service truck was located at a Marriott Hotel in Overland Park, Kansas. After receiving information that co-defendant Timothy Taylor[2] checked into the hotel using his *737 Louisiana driver's license, DeSoto Parish deputies located Timothy Taylor's father's address in Shreveport, Louisiana, and learned defendant's mother had been by the apartment in search of her son. A neighbor also told the police Timothy Taylor and defendant were seen at the apartment a few hours after the victim's murder. Arrest warrants for defendant and Timothy Taylor were subsequently issued on January 13, 1999.
Two days later, on January 15, 1999, U.S. Customs Inspector Jeffrey Garner was working at the United States Border Station in Laredo, Texas. Around 4:30 p.m. two young white males approached him and volunteered that the Mexican officials had sent them back because they did not have the proper documentation to travel into Mexico. After the two men stated they had nothing to declare, Agent Garner searched their bags. In Timothy Taylor's backpack, the agent found a large amount of cash secured in bank rolls, totaling $87,898.13. At this point, Agent Garner explained that currency in excess of $10,000 must be declared to U.S. Customs. In light of their evasive answers about the amount and origin of the money, Agent Garner patted down both men and found $38,496.75 in defendant's pants pocket. After running their names in the National Crime Information Center ("NCIC") computer, Agent Garner discovered both men were wanted for homicide and robbery.
Agent Garner placed defendant and Timothy Taylor in separate holding cells and, subsequently, they individually made handwritten statements concerning the instant offense. In his first statement, defendant denied any involvement in the murder of Chester Howell; however, he admitted to his involvement in the Lamoni, Iowa bank robbery and the shooting of the police chief during the high speed chase. Defendant later made a second statement in which he indicated he accompanied Timothy Taylor to the car dealership. During the test drive, defendant told the victim not to move because Timothy Taylor, who was sitting in the back of the vehicle, had a gun. Defendant then drove to a bridge on Missile Base Road and let the victim out of the car. According to defendant, after Timothy Taylor shot the victim twice, defendant took the gun and fired the last shot into the victim's back. However, in his statement, Timothy Taylor claimed defendant fired all of the shots at the victim. After the statements were taken, both men were subsequently transported to DeSoto Parish.
On January 27, 1999, a DeSoto Parish grand jury returned an indictment charging defendant and Timothy Taylor with first degree murder. Their cases were severed and defendant's trial was moved to Winn Parish based on the extensive media coverage in DeSoto Parish.[3] At defendant's trial, the state presented thirty witnesses from various states who testified to defendant's involvement in the instant offense and his eventual apprehension and return to Louisiana. The defense conceded defendant's guilt, but argued the crime more properly fit second degree murder. After a jury found defendant guilty of first degree murder, the penalty phase ensued.
At the sentencing hearing, the state presented victim impact evidence from the victim's two daughters, his wife, two of his co-workers, and a family friend. Next, the defense called defendant's mother and father, his cousin, an ex-girlfriend, and his best friend. Defendant also testified in his *738 own behalf. Finally, the defense presented the testimony of Dr. Mark Vigen, a forensic psychologist, who described defendant's family history and his findings with respect to defendant's personality and IQ.
Following the penalty phase, the jury returned with a death recommendation after finding the sole aggravating circumstance urged by the state, i.e., defendant was engaged in the perpetration or attempted perpetration of an armed robbery. The trial court formally sentenced defendant to death by lethal injection on October 10, 2000. Defendant now appeals his conviction and sentence, raising nineteen assignments of error.

DISCUSSION

A. Pre-Trial Phase Issues

1. Motion to Suppress. (Assignments of Error Nos. 2 and 11).
Defendant contends the trial court erred by denying his motion to suppress his statements because Customs Inspector Garner lacked probable cause to detain and search defendant at the border.
A search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Border searches constitute one of the exceptions to the probable cause and warrant requirements of the Fourth Amendment. The border search exception permits a government officer at an international border to conduct a routine search and seizure, "without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." United States v. Montoya de Hernandez, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); United States v. Rivas, 157 F.3d 364, 367 (5th Cir.1998)("Under the border-search doctrine, government agents may conduct a `routine search' at the international border or its functional equivalent without probable cause, a warrant, or any suspicion to justify the search.") Furthermore, pat-downs and frisks, the removal of outer garments or shoes and the emptying of pockets, wallets, or purses are all routine searches, and "require no justification other than the person's decision to cross our national boundary." United States v. Sandler, 644 F.2d 1163, 1169 (5th Cir.1981); See also United States v. Vega-Barvo, 729 F.2d 1341, 1345 (11th Cir.1984)(luggage search, pat-down, and frisk are routine searches because they "intrude only slightly on a person's privacy"). Thus, contrary to defendant's argument that Inspector Garner was without authority to pat him down after discovering a large amount of undeclared cash in Timothy Taylor's backpack, defendant's detention and pat-down were permissible as a border search, even in the absence of probable cause. Consequently, this claim fails on the merits.
Defendant further argues the trial court erred by denying his motion to suppress because Customs and FBI agents interrogated him after he had already invoked his right to remain silent.
A review of the transcript from the motion to suppress hearing indicates defendant was placed in a holding cell at approximately five o'clock p.m. After Agent Matthew Schmitt from Customs, accompanied by Inspector Garner, verbally advised the defendant of his Miranda rights, defendant refused to talk to the officers. At this point, the officers immediately left the holding cell. Shortly thereafter, Agents Bradley Manning and Ronald Mesa from Customs arrived on the scene. Agent Schmitt informed the officers he had read defendant his Miranda *739 rights; however, he did not mention defendant had invoked his right to remain silent. According to Agent Manning, he entered defendant's holding cell for the sole "administrative" purpose of obtaining defendant's signature on a Miranda advisement form. At 5:50 p.m., defendant was given his Miranda warnings by Agent Manning and defendant signed a form confirming he understood his rights and further signed a waiver indicating he wanted to make a statement and talk to the officers.
The holding of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), protects an individual's Fifth Amendment privilege during incommunicado interrogation in a police-controlled atmosphere. The privilege guards against compelled self-incrimination and prevents a criminal defendant from being made "the deluded instrument of his own conviction." Culombe v. Connecticut, 367 U.S. 568, 581, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)(Frankfurter, J., quoting 2 W. Hawkins, Pleas of the Crown 595 (8th ed. 1824)). Miranda does not require that a defendant exercise his right to remain silent by any particular phrasing. In fact, the Supreme Court in Miranda stated, if the individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-474, 86 S.Ct. 1602.
When a defendant exercises his privilege against self-incrimination the validity of any subsequent waiver depends upon whether police have "scrupulously honored" his right to remain silent. Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Whether police have "scrupulously honored" an accused's right to silence is determined on a case-by-case basis under the totality of the circumstances. Id.; State v. Brooks, 505 So.2d 714, 722 (La.1987); State v. Harper, 430 So.2d 627, 633 (La.1983); State v. Thucos, 390 So.2d 1281, 1285 (La.1980); State v. Manning, 380 So.2d 46, 50 (La.1980). Factors going into the assessment include who initiates further questioning, although, significantly, police are not barred from reinitiating contact, Mosley, 423 U.S. at 103-104, 96 S.Ct. 321; cf. Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (invocation of right to counsel during custodial interrogation has greater protection than invocation of right to remain silent, as police may not thereafter question defendant unless he initiates further contact); whether there has been a substantial time delay between the original request and subsequent interrogation; whether Miranda warnings are given before subsequent questioning; whether signed Miranda waivers are obtained; and, whether the later interrogation is directed at a crime that had not been the subject of the earlier questioning. Michigan v. Mosley, 423 U.S. at 105, 96 S.Ct. 321; Brooks, 505 So.2d at 722; Harper, 430 So.2d at 633.
Here, many of the Michigan v. Mosley factors for determining "scrupulous honoring" of the right favor the state. Although Agent Manning approached defendant shortly after[4] defendant had already refused to speak with Agent Schmitt, Agent Manning was unaware of defendant's invocation of his right to silence. Instead, Agent Manning only knew defendant had received a verbal advisement of his Miranda rights. To secure a signed acknowledgment confirming defendant was *740 read his rights, Agent Manning, following routine procedure, met with defendant and re-administered the Miranda warnings; thus, there is no showing that Agent Manning approached defendant with the intention of browbeating him into making a statement. At any rate, Agent Manning's recitation of Miranda rights can hardly be considered an "interrogation." See State v. Holmes, 467 So.2d 1177, 1185 (La.App. 2d Cir.1985)(court reluctant to call officer's questioning of defendant an "interrogation" about the crime when he only asked defendant whether he understood his rights and would waive them).
Furthermore, neither Agent Schmitt nor Agent Manning mentioned the charges against defendant. In fact, Agent Manning was aware only of the fact that defendant's name appeared on the NCIC computer. Given defendant was merely re-advised of his rights by a different officer who had no knowledge of the offenses committed by defendant, defendant's decision to change his mind and waive his rights and speak with Agent Manning was voluntary and intelligent and not the product of police misconduct. Cf. State v. Hohn, 95-2612, pp. 7-8 (La.App. 4 Cir. 1/19/96), 668 So.2d 454, 459 (agents failed to honor scrupulously request to remain silent when police initiated further questioning; time delay between original refusal and subsequent questioning was relatively brief; defendant was not advised of his rights before questioning, although he was advised when he began discussing his case; acknowledgment of rights was signed by defendant but not the waiver and the form was not presented to defendant until after his inculpatory statement had been made). Consequently, defendant fails to show the trial court erred when it denied his motion to suppress his statements.

B. Guilt Phase Issues

1. Other Crimes Evidence. (Assignments of Error Nos. 1, 10, 12).
First, defendant takes issue with the state's introduction of inflammatory evidence concerning his participation in other crimes committed after the instant offense, and before his arrest at the Mexican border several days later, i.e., the Lamoni, Iowa armed bank robbery; the subsequent shooting of the Lamoni police chief during a high speed chase; the theft of a truck in Missouri; and, defendant's and Timothy Taylor's failure to declare the large amount of cash they were carrying when Inspector Garner stopped them at the border. In defendant's view, evidence of the crimes occurring after the instant offense, which was introduced through witness testimony and defendant's statements, did not constitute an integral part of the crime charged and did not fall under any recognized exception set forth in La. C.E. art. 404(B)(1).[5] Defendant also argues this massive evidentiary presentation detailing a week-long, seven-state crime spree overwhelmed the guilt phase of trial, as it took twenty-three witnesses to present the other crimes evidence and only seven to establish defendant's commission of the charged offense.
Before trial, defendant objected to the state's introduction of the res gestae evidence listed above; however, the trial court overruled the objection, finding the other crimes evidence was admissible as res gestae evidence. See La. C.E. art. 404(B)(1) (evidence constituting an integral part of the act or transaction that is the *741 subject of the present proceeding). After trial commenced, defendant twice re-urged the objection to the other crimes evidence and offered to stipulate to the state's anticipated testimony concerning the other crimes. The state flatly refused the stipulation, noting the other crimes evidence went to identity and intent. After three of the state's witnesses finished their testimony about defendant's role in the Lamoni, Iowa bank robbery and the subsequent shooting of the Lamoni Chief of Police,[6] the trial court expressed concern as to the repetitiveness of the next state witness's testimony regarding the bank robbery and ordered the state to narrow the focus of its direct examination. At the conclusion of the testimony about the bank robbery, defendant moved for a mistrial which the trial court denied. The state then proceeded with testimony from two Missouri deputies who discovered the abandoned Pontiac Firebird, a cab driver who drove defendant and Timothy Taylor to a hotel in Kansas, the hotel clerk who saw Timothy Taylor's driver's license, and nine law enforcement officers representing Customs, FBI, and DeSoto Parish who testified to the circumstances of defendant's arrest, the contents of his statements, and the evidence linking the instant offense to defendant.
Generally, courts may not admit evidence of other crimes to show defendant is a man of bad character who has acted in conformity with his bad character. However, under La. C.E. art. 404(B)(1) evidence of other crimes, wrongs or acts may be introduced when it relates to conduct, formerly referred to as res gestae, that "constitutes an integral part of the act or transaction that is the subject of the present proceeding." Res gestae events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them. A close proximity in time and location is required between the charged offense and the other crimes evidence "to insure that `the purpose served by admission of other crimes evidence is not to depict defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" State v. Colomb, 98-2813, p. 3 (La.10/1/99), 747 So.2d 1074, 1076 (quoting State v. Haarala, 398 So.2d 1093, 1098 (La.1981)). The res gestae doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances. State v. Huizar, 414 So.2d 741, 748 (La.1982); State v. Kimble, 407 So.2d 693, 698 (La.1981). In addition, as this court recently observed, integral act (res gestae) evidence in Louisiana incorporates a rule of narrative completeness without which the state's case would lose its "narrative momentum and cohesiveness, `with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.'" Colomb, 747 So.2d at 1076 (quoting Old Chief *742 v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)).
Although defendant contends the evidence of other crimes was erroneously admitted as res gestae because the crimes involved different victims in different states, over a seven-day span, as discussed above, the doctrine of res gestae is designed to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. In State v. Edwards, 406 So.2d 1331, 1350-1351 (La.1981), testimony that defendant and another accomplice arrived at a third person's house; that defendant suggested they "go make a hit;" that they first went to grocery store where defendant stole some wine; that they ultimately went to the victim's house, killed her, and sped away from the scene in the victim's automobile; that they followed another woman to a college campus in an attempt to snatch her purse but abandoned the plan when she saw them coming; and that they went to a convenience store looking for still another "hustle" until the appearance of a police officer terminated the night's activities, was admissible as part of the res gestae in defendant's trial for the victim's murder. Again, in State v. Brewington, 601 So.2d 656 (La.1992), this court held the trial court did not err in permitting the prosecution to admit evidence which tended to show the accused possessed crack cocaine and a .357 caliber pistol "three hours after the victim was last seen alive in his presence and less than two hours before her death" because the evidence, "formed an inseparable part of the state's substantial circumstantial evidence linking him to the shooting," and because evidence of cocaine possession was "an integral part of the act or transaction that was the subject of the present proceeding." See also State v. Matthews, 292 So.2d 226, 227 (La.1974) (testimony that defendant, who was charged with armed robbery, stopped four persons and demanded their coats and when one person attempted to flee, defendant shot and killed him, demonstrated the robbery and shooting were part of a single, continuous transaction, integrated in both space and time, and testimony and photographs relating to the death of one of the victims were admissible).[7]
At first blush, defendant seems correct that the events happening in far-away Iowa, Kansas, and in Texas at the Mexican border, occurring within a seven-day span of time, could not possibly qualify under a doctrine meant to place the charged crime in its immediate context of happening near in time and in place. Clearly, as the state traced the movements of defendant and Timothy Taylor, the events detailed by its evidence, especially after the bank robbery in Iowa, became increasingly remote in time and in place, so much so that it would be difficult if not impossible to say the charged crime gave defendant notice of the truck theft in Kansas or the currency reporting violation at the Mexican border.
*743 However, under the rule of narrative completeness incorporated in the res gestae doctrine "the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault." Old Chief, 519 U.S. at 188, 117 S.Ct. 644. In the present case, the defense virtually compelled the state to present the entirety of the Taylor crime spree by suggesting throughout trial that defendant was only guilty of second degree murder because although he had formed the specific intent to kill the victim, he had not been part of Timothy Taylor's plan to take the Pontiac Firebird for the purpose of the bank robbery scheme. Further, defendant pointed out it was Timothy Taylor who knew about the bank in Lamoni, Iowa, because he had previously lived in that state, was familiar with the bank, and knew it lacked adequate security. In this view of the evidence, defendant asserted he was therefore not guilty of first degree murder, i.e., a specific intent felony murder. Apart from the question of whether the state's evidence technically qualified as res gestae or under the "plan" exception to other crimes evidence in La. C.E. art. 404(B) (see discussion below), the evidence was clearly relevant for purposes other than simply proving the criminal disposition of defendant. It placed the killing of the victim in its proper context, i.e., as the starting point of grand scheme to rob the bank in Lamoni, Iowa, and then to make a run for the Mexican border, as if the entire episode were an out-take from defendant's favorite movie, Natural Born Killers. It also allowed jurors to conclude that defendant was an integral part of the scheme from the outset and that he was therefore as morally and legally culpable for the first degree murder of the victim as Timothy Taylor. Moreover, as the state points out because of the lack of physical evidence at the scene of the victim's murder and the fact that none of the victim's co-workers at the car dealership could positively identify defendant or Timothy Taylor, the bank robbery and the events that followed provided local law enforcement with the first break in the investigation. Consequently, the state could not have logically presented its case against defendant without telling the jury why the suspicions developed, and therefore, the evidence was admissible under the res gestae doctrine.
Moreover, the fact the other crimes occurred in different locations with different victims is not dispositive of the issue. As long as the other crimes "constitute an integral part of the act or transaction that is the subject of the present proceeding," they are admissible as res gestae evidence. La. C.E. art. 404(B)(1); Haarala, 398 So.2d at 1096-1097 (in prosecution for simple burglary of hardware store, references to possible attempted break-in of drugstore were properly admitted as part of the res gestae; beating on drugstore door had prompted complaint to the police and subsequent investigation; thus, reference to that disturbance was necessary to show immediate context out of which charged offense arose and to present state's case accurately, and to bolster state's theory that tools were taken from hardware store in order to break into drugstore across alleyway).[8]
*744 Although defendant contends the other crimes evidence was unnecessary given his admission of guilt, his concession was subject to the caveat that defendant was only guilty of second degree murder. Additionally, defense counsel argued defendant was oblivious to Timothy Taylor's grand scheme to rob a bank in Lamoni, Iowa, which also included committing an armed robbery and murder of the instant victim to secure transportation for the trip. Thus, as the state persuasively asserts, when the defense made specific intent an issue during its opening statement, evidence of the bank robbery not only proved defendant's knowledge and active participation in the crime spree which was set into motion with the robbery and murder of the instant victim, the testimony also provided the jury with a motive as to why the instant victim was killed, i.e., in furtherance of the bank robbery. This court, and other Louisiana courts have admitted evidence of other crimes under the "plan" exception in numerous and varied circumstances. For example, in State v. Williams, 96-1023, p. 30 (La.1998), 708 So.2d 703, 725-726, evidence defendant committed a robbery which involved a gun, just hours before the crime charged, was held admissible in a first degree murder prosecution. The court in Williams noted that even though the evidence of the crime was inadmissible to show modus operandi because defendant confessed to shooting the victim (therefore identity was not at issue), evidence of the earlier shooting was relevant to show defendant intended to fire the gun at the victim even though he claimed the gun accidently went off. Id.; See also State v. Jackson, 625 So.2d 146, 150 (La.1993)("[when] the element of intent is regarded as an essential ingredient of the crime charged, it is proper to admit proof of similar but disconnected crimes to show the intent with which the act was committed."); State v. Mattheson, 407 So.2d 1150, 1159-1160 (La.1981)(admission of evidence in first degree murder case, which related to armed robberies that took place after the murder and were part of one continuous transaction, which was relevant to negate the defense that defendant was intoxicated and that such condition precluded formation of specific intent and which was also res gestae evidence, was not error, though defendant admitted that murder was committed in course of armed robbery).
Accordingly, although other crimes evidence may not be admitted to show a defendant is a "criminal type," and is thus likely to have committed the instant crime, when the very doing of the act charged, here, specific intent to kill, is still to be proved, one of the facts which may be introduced into evidence is the person's design or plan to do it. 2 Wigmore, Evidence § 304, p. 249 (James H. Chadbourn Rev. Ed.1979). Moreover, defendant cannot control the state's method of proof. In a criminal prosecution, the state has the *745 burden of proving each element of the crime beyond a reasonable doubt. A defendant may not exclude from the jury's consideration relevant evidence concerning a crime merely by offering to stipulate. Old Chief, 519 U.S. at 186-87, 117 S.Ct. at 653 (A "familiar standard rule" in the criminal law is that "the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, that a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it."). Hence, the trial court did not err in allowing evidence of other crimes despite defendant's concession of guilt to second degree murder.
Next, defendant asserts that even if the evidence was admissible as part of the res gestae of the crime, it was nevertheless barred by the balancing test of La. C.E. art. 403 because the testimony discussed above unduly prejudiced the jury. Under La. C.E. art. 403, otherwise admissible evidence may nevertheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. Before trial, the trial court held that other crimes evidence was more probative than prejudicial under La. C.E. art. 403.
Previous jurisprudence held that when evidence of other bad acts is admissible as res gestae, the probative value of the evidence need not be balanced against its prejudicial effect. State v. Brown, 428 So.2d 438, 442 (La.1983). However, current cases question whether the integral-act evidence under La. C.E. art. 404(B) remains subject to the balancing test of La. C.E. art. 403. See Colomb, 98-2813 (La.10/1/99), 747 So.2d 1074. At any rate, the prejudicial effect of the evidence admitted in the instant case does not substantially outweigh its probative value. Although all evidence of other crimes is prejudicial to defendant, the other crimes evidence was necessary to give the jury a complete picture of the events which gave rise to the instant offense and led to the defendant's ultimate arrest along with a context within which to evaluate defendant's assertions that he was a passive participant acting pursuant to Timothy Taylor's command. Furthermore, contrary to defendant's claims, the state cannot be faulted for the amount of other crimes evidence introduced at trial given defendant went on a crime spree which spanned seven states.[9] In any event, the trial court admonished the prosecution when the testimony became repetitive. Thus, to the extent defendant's pattern of conduct tended to negate his claim of mere acquiescence in the instant offense and revealed the intent with which he killed the victim, the evidence was properly admitted under La. C.E. art. 403.[10]
Within this claim, defendant further argues the state's cross-examination of defendant regarding his alleged gun ownership lacked any factual basis and constituted inadmissible other crimes evidence. The state counters with a statement made by Crystal Morrison, a friend of defendant, which indicated defendant owned firearms in the past and had threatened people with a shotgun. According to the state, the statement made to FBI agents, was turned over to the defense in discovery. The state planned on calling *746 Ms. Morrison as a rebuttal witness; however, she failed to appear for trial. At any rate, the subject of firearms originated in defense counsel's opening statement in which he announced defendant "ha[d] no previous knowledge of how to use firearms." In fact, a review of the record shows defense counsel was the first to ask state witnesses about whether defendant had ever been seen with a firearm. While it is true the state thoroughly cross-examined defendant as to his familiarity with firearms, defendant steadfastly maintained that he never owned a pistol although he admitted to stealing a starter pistol from his cousin and owning a shotgun. As such, defendant cannot now complain that such evidence prejudiced him given the defense counsel opened the door to this line of questioning. Cf. State v. Smith, 96-0261, pp. 28-29 (La.App. 2 Cir. 12/30/96), 687 So.2d 529, 528 (state may discuss confession during closing arguments after the defense "opened door" by repeatedly referring to confession during trial); State v. Harvey, 26,613, p. 5 (La. App. 2 Cir. 1/25/95), 649 So.2d 783, 787 (state may lay foundation to refute self defense theory after the defense "opened the door" by asserting a self defense theory during its opening statement). Notably, defense counsel failed to object to the state's cross-examination of defendant with respect to his alleged gun ownership. La. C.Cr. P. art. 841; State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364, 369 (scope of review in capital cases is limited to alleged errors occurring during the guilt phase that are contemporaneously objected to).
Defendant next complains the state introduced "bad thoughts" evidence during its opening statement and rebuttal when the state informed the jury defendant told his friends he wanted to "kill somebody" before he died. In addition, the state elicited testimony to that effect from defendant's friend Michael Wilcox, who also indicated defendant wanted to go out in a "blaze of glory." As part of this argument, defendant further points to the state's eliciting of testimony concerning his favorite movie, namely, Natural Born Killers. Specifically, Wesley Medaris, a friend of defendant who testified for the state, indicated defendant critiqued the bank robbery featured in the film and discussed how he would perpetrate a bank robbery by "pop[ping] a cap in the [guard's] ass."
However, the statements constituted direct assertions of defendant's state of mind, La. C.E. art. 803(3)(providing hearsay exceptions for statements of then existing state of mind offered to prove defendant's future acts); see State v. Martin, 458 So.2d 454, 460 (La.1984), and were relevant to defendant's motive and intent. In addition, the testimony contradicted the defense claim made throughout its opening statement that defendant was acting under the dominion and control of Timothy Taylor who was the real mastermind behind the instant offense and the subsequent bank robbery. Nevertheless, during defense counsel's cross-examination, the witnesses made clear that defendant's statements were made in jest. Furthermore, during the defense's re-cross of Wesley Medaris, the witness testified, contrary to the state's suggestion, that defendant never indicated wanting to "go out in a blaze of glory." Under these circumstances, this argument is without merit.
Finally, defendant complains of the state's repeated references to his facial piercings during the testimony of the two bank robbery witnesses. However, testimony concerning the piercings served to identify defendant as playing an active role in the bank robbery in contrast to the defense theory that defendant was only following orders. Specifically, the bank *747 robbery witnesses unequivocally identified the perpetrator with the pierced tongue (i.e. defendant) as an equal participant in the bank robbery who used profanities and wielded a pistol. Furthermore, defendant failed to object and preserve this claim for appeal. Taylor, 669 So.2d at 369. In fact, defense counsel attempted to use the testimony to defendant's advantage by acknowledging defendant's pierced tongue and arguing in his closing statement:
Michael Taylor is vulnerable. He's an impressionable 20 year old. What's wrong with that? My children are impressionable. They listen. They hear others. And they follow and do what others do. Every child, every young person is impressionable just to get in with the in crowd. To be a part of it. And if you're a person who, what I call, a follower, that's even more the reason that he would put an earring in his tongue.
As such, the testimony cited to by defendant does not rise to the level of prejudice warranting reversal.

2. Admission of Non-Testifying Co-Defendant's Statement and Demeanor. (Assignment of Error No. 3).
Defendant maintains the state violated his confrontation rights by eliciting testimony about his non-testifying co-defendant, Timothy Taylor's, statement to police. Specifically, defendant claims law enforcement officers alluded to the inconsistencies in the statements with respect to who shot the victim.
During the state's direct examination, Agents Manning, Mesa,[11] and Lacey explained defendant made a second statement after he was informed that his initial statement did not match Timothy Taylor's version; however, the state did not inquire as to the content of Timothy Taylor's statement at this point. On the other hand, as defendant concedes, defense counsel delved into the specific inconsistencies between the statements made by the defendant and Timothy Taylor. First, defense counsel elicited testimony from Agent Manning indicating defendant and Timothy Taylor disagreed as to who fired the first two shots at the victim. Defense counsel then cross-examined Agent Mesa who testified defendant and Timothy Taylor "pointed the finger at each other" with respect to the victim's murder. In a particularly lengthy exchange with Agent Marshall, defense counsel again inquired as to who claimed to have fired the shots. According to Agent Marshall, Timothy Taylor stated defendant fired all three shots. While it is true the state asked similar questions of Agent Lacey during its direct examination, it is apparent that this line of inquiry now objected to by defendant originated with the defense. In addition, the defense also cross-examined Agent Lacey about the content of Timothy Taylor's statement.
La. R.S. 15:273 provides: "The accused shall have the right to be confronted with the witnesses against him and the depositions of witnesses shall not be evidence either for or against him except as provided by law." In the instant case, the statement made by Timothy Taylor clearly did not interlock with defendant's own statement as to who fired the shots and therefore did not constitute substantive evidence against defendant under Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).[12] Timothy Taylor's *748 statement was not selfinculpatory to an extent that it could be considered a statement against interest, and therefore admissible as a matter of La. C.E. art. 804(b)(3) against defendant. Nor does Timothy Taylor's statement fall within any other hearsay exceptions. However, while Timothy Taylor's statements likely constitute inadmissible hearsay, the jurors were fully aware that two individuals were charged with the instant murder and being tried separately. Consequently, the parties were required to educate the panel on the law of principals, and after being so informed, any reasonable juror could have made the inevitable conclusion that each defendant was blaming the other for the crime. In addition, while there may have been disagreement as to who fired how many shots, in his second statement, defendant admitted firing the last shot which went into the victim's back and killed him. That being the case, admission of the hearsay evidence was harmless. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); See also State v. Wille, 559 So.2d 1321, 1332 (La.1990)(admitting hearsay which is merely corroborative and cumulative of other properly introduced evidence is harmless). Moreover, as discussed above, defense counsel first engaged in this risky line of questioning during its cross-examination of the state's witnesses and further failed to object to the state's subsequent direct examination on this subject.[13] Given the state's initial questions did not concern the substance of Timothy Taylor's statement and the fact defense counsel opened the door to the content and inconsistencies between the two defendants' statements, this claim, which is framed solely as a trial error, is without merit.
Included in this argument, defendant asserts the state improperly examined law enforcement officials about Timothy Taylor's demeanor. First, Agent Manning, during the state's direct examination, testified Timothy Taylor seemed "numb" and described him as a follower who was "going along with what the more *749 dominant one was telling him." Agent Mesa further stated on direct that Timothy Taylor was more reserved than defendant. Finally, in response to the state's question, Agent Marshall testified Timothy Taylor was quieter than defendant and not "as arrogant or cocky;" however, the agent indicated "neither [defendant] seemed particularly concerned about their situation."
Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence." La. C.E. art. 401. Although relevant, evidence may be excluded if its probative value is outweighed by its prejudicial impact, will mislead the jury, or confuse the issues. La. C.E. art. 403.
In defendant's view, the agents' testimony concerning Timothy Taylor's passive demeanor improperly focused the jury on his Timothy Taylor's statement in which he claimed defendant was the aggressor and fired all three shots. However, as discussed supra, defense counsel elicited the majority of the testimony concerning the content of Timothy Taylor's statement. Furthermore, the issue of defendants' demeanor was first raised during the defense's opening statement. Thus, testimony concerning Timothy Taylor's "passive" demeanor at the time of his arrest was relevant to rebut defendant's contention that Timothy Taylor was in charge. Moreover, defense counsel declined to object to the state's questions about Timothy Taylor's demeanor, and instead, cross-examined Agent Marshall about Timothy Taylor's demeanor which the witness described as calm and "more passive" than defendant. Under these circumstances, the non-objected-to testimony constituted rebuttal evidence and its probative value outweighed any prejudicial effect. Accordingly, this assignment of error is meritless.

3. Cross-Examination of State Witness. (Assignment of Error No. 13).
By this assignment, defendant contends the trial court improperly curtailed defense counsel's cross-examination of Inspector Garner concerning the circumstances of defendant's interrogation and confession.
During Inspector Garner's testimony on cross-examination, he indicated Agent Schmitt was "writing things down" when he initially met with defendant and Mirandized him. At this point, the state approached the bench and objected to the witness testifying about another agent's handwritten notes. Defense counsel responded that the state's failure to call Agent Schmitt as a witness at trial forced the defense to elicit testimony about the notes through Inspector Garner. However, the trial court sustained the state's hearsay objection and further noted the defense could have subpoenaed Agent Schmitt as a defense witness.
As background to this issue, at the hearing on defendant's motion to suppress, Inspector Garner first testified Agent Schmitt made a written notation indicating defendant invoked his right to silence. Agent Schmitt subsequently confirmed making a written recording of defendant's invocation during his testimony. When defense counsel moved to examine the agent's notes, the trial court denied his request after finding the notes did not constitute an initial report. During trial, the issue resurfaced when defense counsel sought to inform the jury of the circumstances surrounding defendant's confession, namely that he purportedly invoked the right to counsel.
In defendant's view, the trial court's ruling preventing him from asking Inspector Garner about the notes taken by Agent Schmitt during their meeting with defendant *750 limited his ability to introduce evidence the agents failed to honor his right to silence. However, the trial court ruled the evidence concerning his confession was a legal issue that went to "whether a constitutional breach" occurred and was already determined when the trial court denied defendant's motion to suppress. The trial court was only partially correct. While the voluntariness of defendant's confession was a matter of law for the court to determine in ruling on the admissibility of the statement, defendant was entitled to introduce evidence regarding the circumstances under which he gave the statement, including any overbearing conduct used by the police, to provide jurors with a context for assessing the weight they should give the statement. La.C.Cr. P. art. 703. See Crane v. Kentucky, 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ("[R]egardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubts on its credibility."); see also State v. Williams, 01-1650, p. 8 (La.11/1/02), 831 So.2d 835, (Statutory rule of La.C.Cr. P. art. 703(A) which permits defendant to introduce evidence at trial as to the circumstances surrounding his confession "has its underpinnings in the Due Process Clause and it necessarily operates independently of any credibility determinations the trial court made in ruling on the voluntariness of the statement as a matter of law.")
Nevertheless, the jury was fully informed of the circumstances of defendant's interrogation and the voluntariness of his confession through defense counsel's cross-examination of the Customs and FBI agents who met with defendant. First, Inspector Garner testified defendant invoked his right to silence after Agent Schmitt advised him of his rights. Inspector Garner repeated this testimony on both redirect and re-cross-examination. Furthermore, Agent Manning testified on cross-examination that Agent Schmitt had not mentioned defendant's prior invocation of his right to silence before Agent Manning readvised defendant of his Miranda rights. This same line of questioning was continued by defense counsel during his cross-examination of Agent Manning's partner, Agent Mesa. In addition, Agent Marshall, an FBI agent who interviewed defendant after Agent Manning, stated during cross-examination that he had been informed defendant refused to talk to Agent Schmitt, but was unaware defendant had previously invoked his right to silence. Under these circumstances, defendant does nothing to show that evidence of Agent Schmitt's notes documenting defendant's invocation of his right to silence would not have been merely cumulative in light of the other agents' testimony confirming that fact. Cf. State v. Welcome, 458 So.2d 1235, 1243 (La.1984)(when excluded evidence would have been merely cumulative of evidence presented at trial, any error by court in not admitting evidence is harmless). Moreover, as the trial court pointed out, the defense had the power to subpoena the witness, see generally La.C.Cr. P. art. 731, but failed to do so. Consequently, this assignment of error lacks merit.

C. Penalty Phase Issues

1. Introduction of Arbitrary Factors. (Assignment of Error No. 17).
Defendant contends the defense counsel's performance interjected an arbitrary factor into the sentencing proceeding.
*751 While defendant asserts defense counsel denigrated the defense's mitigation evidence, emphasized the gravity of the instant offense, and pointed out defendant's father asked the jury to vote for the death penalty, appellate counsel stops short of claiming explicitly that defense counsel was ineffective. At any rate, defense counsel's division of evidence into minor and major mitigators did not diminish the importance of mitigation evidence; instead, defense counsel focused the jury's attention on the most relevant mitigators as they applied to the instant defendant, i.e., his youth, his lack of a significant criminal history, his dysfunctional upbringing, and his acceptance of responsibility for the instant crime. Clearly, the jury rejected the defense theory that defendant was acting under the dominion and control of Timothy Taylor's when they returned a verdict of first degree murder; therefore, it appears defense counsel made a tactical decision to downplay that mitigator during the penalty phase. Next, defense counsel's description of the instant offense as a "terrible crime" does not appear prejudicial given the defense strategy of conceding defendant's guilt. See State v. Burkhalter, 428 So.2d 449, 457 (La.1983)(admission of guilt to second degree murder helped defendant avoid death penalty); State v. Berry, 430 So.2d 1005, 1014-1015 (La.1983)(admission of intent to rob held not ineffective because intent was obvious and counsel, in arguing defendant was not guilty of first degree murder, was establishing candor with the jury). Finally, defense counsel did inform the jury during his opening statement at the penalty phase that defendant's father, who was incarcerated for committing two murders, would give his opinion on the appropriate punishment for his son's crime. Specifically, defense counsel argued:
Moreover, his father is in the penitentiary for committing two manslaughters. And he's going to tell you something. He's going to tell you that he's been there for 22 years and if you want to do his son a favor, you vote for the death penalty. But if you want to punish him, you send him to jail for the rest of his life, make him think about what he did every day of his life just like he's had to think about what he did 22 years ago every day that he's been in the penitentiary, punish him.
Thus, in an attempt to persuade the jury to spare defendant's life, defense counsel used the testimony of defendant's father to diminish the severity of the death penalty. The fact a particular strategy is unsuccessful does not equate to professional incompetence. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Brooks, 505 So.2d at 724; State v. Felde, 422 So.2d 370, 393 (La.1982). Accordingly, this assignment of error is without merit.

D. Other Miscellaneous Issues

1. Excessive Victim Impact Evidence. (Assignment of Error No. 8).
First, defendant contends the state impermissibly commented on the victim's character during his opening statement at the guilt phase when he asked the jury:
What do you think Chester Howell wanted to do before he died? He probably wanted to watch his kids graduate from school. He probably wanted to take them off to college one day. He probably wanted to walk his daughters down the aisle one day when they got married. But Chester Howell didn't get to do what he wanted to do before he died because that man wanted to kill somebody before he died.
In addition, defendant maintains the state went beyond the proper scope of *752 examination by eliciting testimony about the victim's good character through its direct examination of Jay Kerr, the victim's co-worker. Specifically, when the state asked Mr. Kerr to describe the victim, he testified (notably, without objection) as follows:
Chester was a[n] extremely affable, generous, sweet man. He was easy to work with. He was, I mean he was an asset to the dealership. He fit in real well with everyone and he was just a nice man, nice family man.
With respect to the state's opening statement, a review of the record reveals the defense counsel objected, claiming the state's opening was argumentative and the trial court sustained the objection and further ordered the state to "move on." This court has held that if an objection is sustained, a defendant cannot complain of the alleged error on appeal unless at trial he requested and was denied either an admonition or a mistrial. State v. Michel, 422 So.2d 1115, 1121 (La.1982); State v. Sharp, 414 So.2d 752, 755 (La.1982). Because defense counsel did not request an admonition or mistrial following his objection, defendant waived any claim concerning the state's opening statement.
In any event, neither the state's opening statement nor Mr. Kerr's testimony technically constitutes victim impact evidence. State v. Bernard, 608 So.2d 966, 967-968 (La.1992) defines victim impact testimony as evidence of the character of the victim, evidence of the emotional, physical, and economic impact of the crime on the family of the murdered victim, and not evidence of the survivors' opinions of the crime and of the murderer. This court held that evidence of the survivors' opinions of the crime and of the murderer are clearly irrelevant to any issue at a sentencing hearing. Id. Thus, "victim impact evidence" has a highly specific meaning. In the present case, the state's opening statement and the testimony of the victim's co-worker were not offered in the penalty phase for the purpose of recounting the impact of the crime; thus, it should not be described as such. Even assuming the state's statement and the testimony from Mr. Kerr were irrelevant, the evidence was hardly prejudicial, considering it merely humanized the deceased victim and did not overly detail the victim's good qualities.
Next, defendant argues that during the penalty phase, the trial court allowed two of the victim's co-workers and a family friend to testify, over defense objection, regarding the victim's relationship with his family and the impact the victim's death had on his family.
As an initial matter, at the time of trial, the legislature had amended La.C.Cr. P. art. 905.2(A),[14] to provide that non-family *753 members may testify in capital sentencing hearings:
The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates.
Thus, as the trial court correctly found, under the current version of La.C.Cr. P. art. 905.2(A), victim impact testimony from the victim's co-workers and friends at the capital sentencing hearing would be appropriate, even though they were not family members of the victim. Furthermore, defendant does not challenge the retroactivity of La.C.Cr. P. art. 905.2(A), but instead complains the victim impact testimony from the victim's co-workers and friend exceeded the bounds of Bernard. In Bernard, this court held that:
... some evidence of the murder victim's character and of the impact of the murder on the victim's survivors is admissible as relevant to the circumstances of the offense or the character and propensities of the offender. To the extent that such evidence reasonably shows that the murderer knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors, and the murderer nevertheless proceeded to commit the crime, the evidence bears on the murderer's character traits and moral culpability, and is relevant to his character and propensities as well as to the circumstances of the crime. However, introduction of detailed descriptions of the good qualities of the victim or particularized narrations of the emotional, psychological and economic sufferings of the victim's survivors, which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury's sentencing decision. 608 So.2d at 972.
In the instant case, the three witnesses, whose testimony amounted to eight and one-half pages of transcript, did not give detailed lists or descriptions of the victim's good qualities, nor did they give a lengthy particularized narration of the emotional and psychological sufferings of themselves or the other survivors. See State v. Taylor, 93-2201, p. 12 (La.2/28/96), 669 So.2d 364, 371 (in finding the victim impact evidence was harmless, the court noted "surely the jury regarded the testimony of these victim impact witnesses as normal human reactions to the death of a loved one"). While defendant complains Mr. Nash, one of the victim's co-workers, described the victim as a devout Catholic, the defense voiced no objection to the witness's brief comment, an indication that the defense also found the remark non-prejudicial. Taylor, 669 So.2d at 375 ("[T]he lack of an objection demonstrates the defense counsel's belief that the live [remarks] despite [their] appearance in the cold record, [were] not overly damaging.").
In his last argument concerning victim impact evidence, defendant challenges the trial court's ruling allowing *754 the state to introduce three photographs of the victim with his family.
At the Bernard hearing held before the penalty phase, defense counsel stipulated to the admissibility of a wedding photograph of the victim and his wife; however, defense counsel objected to the state's introduction of two additional photographs of the victim with each of his two daughters. The trial court overruled the defense objection.
Aside from his bare allegation of prejudice, defendant fails to show how the state's introduction of two photographs depicting the victim with each of his daughters so influenced the jury as to amount to reversible error. La.C.Cr. P. art. 921. Under these circumstances, defendant's claims concerning victim impact evidence are meritless.

2. Disproportionate Sentence. (Assignment of Error No. 5).
Defendant maintains his sentence is disproportionate when compared with that of Timothy Taylor's sentence who was tried after him and convicted of first degree murder, but sentenced to life imprisonment. This assignment of error will be treated infra, in the Capital Sentence Review section.

SENTENCE REVIEW
Under La.C.Cr. P. art. 905.9 and La. S.Ct. R. 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
In the instant case, the trial court has submitted a Uniform Capital Sentence Report as required by La. S.Ct. R. 28 § 3(a), and the Department of Public Safety and Corrections has submitted a Capital Sentence Investigation Report as required by La. S.Ct. R. 28 § 3(b). In addition, the state filed a Capital Sentence Review Memorandum.
These documents indicate defendant is a white male born on October 19, 1978. He was twenty-one years old at the time of the offense. Defendant has no siblings and his parents divorced after four years of marriage. He never knew his biological father, Kenneth Tubbs, who is currently incarcerated for two counts of manslaughter. When defendant's mother remarried in 1990, defendant moved out to live with other relatives until he was placed in the state's custody for four months in 1996. Following his release, he stayed with relatives and girlfriends. Defendant indicated his stepfather was occasionally physically abusive.
As for his educational background, defendant was expelled in 1993 for blowing up a school toilet and placed on juvenile probation; however, defendant was again expelled in 1994 for writing profanity on a classroom floor. He was sent to an alternative school and earned his GED during his stay in a youth home. Defendant's employment history consisted of minimum wage jobs and he was laid off two months before the instant offense.
According to the UCSR, defense expert Dr. Mark Vigen conducted a psychological evaluation on defendant and diagnosed him with an anti-social personality disorder and a medium IQ of 70 to 100. Dr. Vigen also took note of defendant's dysfunctional childhood. Defendant reported using marijuana, cocaine, speed, and LSD.
*755 Defendant's criminal history reveals only juvenile offenses, including dismissed charges of arson, indecent behavior with a juvenile, theft over $500 dollars, possession of a delayed incendiary device for which he received probation and two counts of simple criminal damage to property for which he was placed in the state's custody for one year. A statement from the DeSoto Parish District Attorney's Office indicates charges arising from the Lamoni, Iowa, bank robbery and the shooting of the police chief will not be pursued because of defendant's instant conviction.

Passion, Prejudice, and other Arbitrary Factors
Defendant maintains that defense counsel's performance during the penalty phase interjected an arbitrary factor into the sentencing proceedings; however, this claim was treated in section C(1) above. In addition, defendant further contends the admission of other crimes evidence from the guilt phase constituted an arbitrary factor which influenced the jury's verdict. For example, defendant points to his commission of misdemeanor offenses, i.e., theft of a license plate, theft of a service truck, and failure to declare currency in excess of $10,000, following the murder of the instant victim.
In this case, the evidence presented by the state during the guilt stage had already fully informed the jury of the circumstances surrounding the victim's death. Thus, reintroduction of that evidence at the penalty phase did not interject an arbitrary factor into the proceeding. See La. C.Cr. P. art. 905.2(A)("The jury may consider [at sentencing] any evidence offered at the trial on the issue of guilt."). Furthermore, the allegedly misdemeanor grade offenses cited by defendant were not mentioned during the penalty phase. Moreover, the state's penalty phase case focused on the impact of the victim's death on his family and on rebutting defendant's mitigation evidence. Accordingly, defendant fails to show an arbitrary factor undermined the fairness of the proceedings.

Aggravating Circumstances
At trial, the state relied on and the jury found the sole aggravating circumstance that defendant was engaged in the perpetration of an armed robbery at the time of the victim's murder. La.C.Cr. P. art. 905.4(A)(1). Here, the evidence clearly established defendant accompanied Timothy Taylor to the car dealership and went on a test drive with the victim. After driving to a remote location, defendant shot the victim, at least once in the back, and fled in the stolen vehicle. Thus, the evidence fully supported the jury's finding of the aggravated circumstance urged by the state.

Proportionality
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990). This Court, however, has vacated only one capital sentence on the ground that it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1, 7 (La.1979), although it effectively decapitalized another death penalty reversal on other grounds. See State v. Weiland, 505 So.2d 702 (La. 1987)(on remand, the state reduced the charge to second degree murder and the jury returned a verdict of manslaughter).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense *756 and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
Jurors in the Eleventh Judicial District, composed of Sabine and DeSoto Parishes, have recommended the imposition of the death penalty on six other occasions. Three of these cases have been reversed by this Court.[15] On January 8, 1999, the state executed Dobie Gillis Williams who was convicted for the stabbing death of a woman in her bathroom while he was on a five-day furlough from prison. State v. Williams, 490 So.2d 255 (La.1986). The remaining two capital defendants are currently incarcerated on death row at the Louisiana State Penitentiary. See State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076 (defendant shot and killed estranged wife and three others); State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158 (defendant beat six-year-old stepson unconscious with a screwdriver and then immersed him in scalding water resulting in the child's death).
In its Capital Sentence Review Memorandum, the state notes that in the case, State v. Burton, 635 So.2d 1343 (La.App. 2d Cir.1993)(unpub'd opinion), defendant killed a car salesman who accompanied him on a test drive. After the salesman was reported missing, his body was found near defendant's home. Defendant subsequently confessed to killing the victim. At trial, the jury convicted defendant of first degree murder and recommended life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. However, in a factually similar case from Jefferson Parish, defendant received the death penalty for the fatal stabbing of the victim whom he lured to a shopping center parking lot on the pretext of wanting to buy a car the victim offered for sale. See State v. Taylor, 422 So.2d 109 (La. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983). Furthermore, considering the fact this case is an armed robbery and the cases are legion in which this court has affirmed capital sentences based primarily on the jury's finding that defendant killed the victim in the course of an armed robbery, it is nearly impossible to conclude that the sentence of death is disproportionate in this case.[16]
*757 Nevertheless, defendant contends his sentence is disproportionate when compared with that of his co-defendant's sentence who was tried after defendant and convicted of first degree murder, but sentenced to life imprisonment. During his trial, Timothy Taylor denied firing any shots at the victim whereas in the instant case, defendant shifted the blame to his accomplice and claimed Timothy Taylor coerced him into shooting the victim.
As a general rule, the fact a co-defendant has received a more lenient sentence does not necessarily indicate the penalty imposed on defendant is excessive. State v. Day, 414 So.2d 349, 352 (La.1982). The analysis above reflects that capital sentences are invariably returned by juries when defendant was the shooter. In the instant case, the state relied on defendant's own statement in which he confessed to grabbing the gun from Timothy Taylor and firing the fatal shot into the victim's back; thus, defendant's sentence does not seem disproportionate under those circumstances. See State v. Chester, 97-2790, p. 23 (La.12/1/98), 724 So.2d 1276, 1289(death sentence imposed in first degree murder case not disproportionate on ground that co-defendant, who was tried and convicted of second degree murder after defendant, was given life sentence; state contended co-defendant was a principal and defendant was shooter, and jury found the evidence supported this conclusion).

DECREE
For the reasons assigned herein and in the unpublished appendix, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) defendant *758 fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La. C.Cr. P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. § 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. § 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts. AFFIRMED.
NOTES
[1] Assignments of error not treated in this opinion are addressed in an unpublished appendix to this opinion.
[2] Timothy Taylor and defendant are not related.
[3] Approximately a year after defendant's trial, in May 2001, a jury convicted co-defendant Timothy Taylor of first degree murder and recommended life imprisonment without benefit of parole, probation, or suspension of sentence.
[4] While defendant claims the passage of time was fifteen minutes, the testimony of the agents at the motion to suppress hearing indicates that at least thirty-five minutes passed before defendant was re-approached.
[5] As part of his complaint, defendant maintains the state failed to "outline" its evidence before trial. However, the state's pretrial memorandum contains a detailed list of the other crimes evidence which it intended to offer at trial.
[6] The first witness called by the state in reference to the Lamoni, Iowa bank robbery was Casey Jeanes who watched the bank robbery from the street and then accompanied the Lamoni Chief of Police on the high speed chase following the robbery. Dale Killpack, the Lamoni Chief of Police, also testified as to his pursuit of defendant and the loss of his right eye after he was shot during the chase. Next, Kirk Bjorland, the bank branch manager, gave a detailed account of the bank robbery.
[7] See also State v. Sharp, 35,714, p. 28 (La. App. 2 Cir. 2/27/02), 810 So.2d 1179, 1196 (other crimes evidence of arson was admissible in homicide prosecution as integral part of events leading up to killing; defendant conducted day-long search for victim that included burning home, breaking into a house to steal a gun, and trading vehicles to avoid detection); State v. Jenkins, 573 So.2d 218, 221-222 (La.App. 5th Cir.1990) (knowledge by police officer of defendant's prior criminal history of drug activities admitted as res gestae); State v. Argo, 476 So.2d 409, 412 (La.App. 2d Cir.1985), writ denied, 481 So.2d 1347 (La.1986) (evidence of offenses committed during seven or eight hours before attempted murder of police officer was admissible as res gestae when crimes so closely related and intertwined that the state could not have presented complete story of the charged offense without them).
[8] See also State v. Bilbo, 97-2189, pp. 9-10 (La.App. 1 Cir. 9/25/98), 719 So.2d 1134, 1139 (evidence defendant, charged with kidnaping, had stolen car from car dealership in Florida six days earlier by threatening car salesman while on test drive, had driven stolen car to California, and was involved in accident in Louisiana just before kidnaping victim who stopped to see if she could assist defendant and his companions with car trouble, was relevant to, and admissible in, kidnaping prosecution, under exception to general rule of inadmissibility of other crimes evidence for conduct that constitutes integral part of act or transaction that is subject of prosecution); State v. Camp, 580 So.2d 957, 960 (La.App. 5th Cir.1991)(witness's reference to knife taken from defendant after his apprehension was admissible as integral part of burglary; even though carrying concealed weapon was not element of that offense, defendant was chased from scene of burglary until he was apprehended, and police arrived soon thereafter and discovered knife); State v. Tarleton, 545 So.2d 1195, 1198 (La.App. 4th Cir.1989)(testimony of second armed robbery victim was admissible against defendant accused of armed robbery under res gestae exception to rule barring admission of evidence of other crimes; defendant's armed robbery of second victim was factor leading to his identification and arrest and extremely relevant to show his connexity with stolen property of complaining victim).
[9] The seven states included Louisiana, Arkansas, Missouri, Iowa, Kansas, Oklahoma, and Texas.
[10] Within this assignment of error, defendant challenges the admissibility of the state's introduction of the other crimes evidence during the penalty phase. This argument is treated infra, in the Capital Sentence Review section.
[11] Although appellate counsel credits Agent Mesa with another statement about the inconsistencies during direct examination, a review of the record reveals the second example cited by defendant was made during defense counsel's cross-examination.
[12] The basis for not admitting the statement of a co-defendant which is sufficiently against his penal interest is the longstanding judicial perception that custodial confessions of non-testifying, unavailable co-defendants are inherently suspect and presumptively unreliable as substantive evidence against defendant. Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). However, the Supreme Court made it clear in Lee that the presumption of unreliability is not absolute. In a critical passage, the Court observed that "[i]f those portions of the co-defendant's purportedly `interlocking' statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement poses too serious a threat to the accuracy of the verdict to be countenanced by the Sixth Amendment." Lee, 476 U.S. at 545, 106 S.Ct. 2056. In Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), the Supreme Court addressed the admissibility of the confession of a co-defendant in the context of the hearsay exception provided by F.R. Evid. 804(b)(3) for declarations against penal interest. Williamson's co-defendant was called by the state, but refused to testify at trial, and the prosecution was allowed to admit his entire confession. The Supreme Court held that "the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally selfinculpatory." Id. at 600-601, 114 S.Ct. 2431. Accordingly, while some parts of a co-defendant's confession may be admissible at a joint trial, under Williamson, the confession must be evaluated, and only those portions which are self-inculpatory may be admitted. Id.
[13] Nevertheless, appellate counsel avoids labeling the defense approach as ineffective and instead limits her criticism to a footnote in which she chastises trial counsel for his ignorance of Bruton, supra.
[14] By 1999 La. Acts, No. 783, § 3, effective January 1, 2000, the legislature amended La. C.Cr. P. art. 905.2(A) to expand the persons capable of testifying at the penalty phase to include close friends of the deceased. The amendment has unquestionably superceded this court's decisions in State v. Frost, 97-1771 (La.12/1/98), 727 So.2d 417 and State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, with regard to those persons entitled to provide testimony as to the impact "that the death of the victim has had" on their lives.

Here, the legislature amended La.C.Cr. P. art. 905.2(A) after the instant offense, but before defendant's trial in July, 2000. As the general thrust of La.C.Cr. P. art. 905.2(A) is to include non-family members' victim impact testimony at the penalty phase of a capital trial, the statute seemingly qualifies either as procedural and so susceptible of retroactive application, see La. C.C. art. 6, or as interpretive and likewise susceptible of retroactive application. See St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809, 820-822 (La. 1992) (legislative enactment directed at jurisprudence apparently interpretive); Keith v. U.S. Fidelity & Guaranty, 96-2075, pp. 6-7 (La.5/9/97), 694 So.2d 180, 183 (legislative enactment overruling case retroactive); Reichert v. State, Dept. of Trans. and Dev. 96-1419, pp. 6-8 (La.5/20/97), 694 So.2d 193, 199 ("The amendment merely clarifies what the original statute purported to enact" and "seeks to rectify the misapplication of the statute by various" courts and so receives retroactive application); Peak v. Tuscaloosa Commerce Bank, 96-1258, pp. 6-7 (La.App. 1 Cir. 12/29/97), 707 So.2d 59, 62 (adopting legislature's statement as to act's overruling effect and applying act retroactively).
[15] The first case is that of George Delano Maxie, who raped, beat, and strangled a woman after abducting her from her backyard. This court reversed defendant's conviction and sentence based upon an erroneous denial of a challenge for cause. State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 534-538. Defendant's retrial is pending.

In State v. Bay, 529 So.2d 845 (La.1988), this court found inadequate proof of an aggravating circumstance necessary to raise the killing to the status of a capital offense. Accordingly, the court reversed and remanded for entry of judgment of guilt of second degree murder and resentencing. Id., 529 So.2d at 848-851.
Finally, in State v. Sepulvado, 342 So.2d 630 (La.1977), defendant shot and killed his cousin, James, and one Bonita Knighton, after an argument erupted while they, defendant and defendant's wife, were shooting tin cans in a Stonewall junkyard. Defendant was sentenced to death on each of the two counts. This court reversed his sentence in light of Roberts v. Louisiana, 428 U.S. 325[, 96 S.Ct. 3001, 49 L.Ed.2d 974] (1976), and remanded for imposition of life sentences. 342 So.2d at 640.
[16] See, e.g., State v. Ball, 00-2277 (La.1/25/02), 824 So.2d 1089 (patron robbed bar and killed beer delivery man in the course); State v. Anthony, 98-0406 (La.4/11/00), 776 So.2d 376 (ex-employee returned to restaurant, shot four employees during armed robbery, killing three); State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, cert. denied, Wessinger v. Louisiana, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999)(defendant shot and killed two people, and injured two people during the course of an armed robbery); State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, cert. denied, Broadway v. Louisiana, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000)(defendant and co-defendant shot and killed police officer escorting grocery store manager who was making a night deposit); State v. Brumfield, 96-2667 (La.10/28/98), 737 So.2d 660, cert. denied, Brumfield v. Louisiana, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999)(same); State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, cert. denied, Williams v. Louisiana, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998)(defendant murdered victim while attempting to rob him in his truck; earlier that day, defendant had shot and wounded another victim during the attempted perpetration of an armed robbery); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, Taylor v. Louisiana, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) (during armed robbery in a Cajun Fried Chicken restaurant where defendant had previously been an employee, he shot and killed one employee and shot and permanently disabled and paralyzed another); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, Scales v. Louisiana, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996) (defendant, while engaged in the armed robbery in a Church's Fried Chicken, shot and killed one of the employees); State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied, Craig v. Louisiana, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997)(defendant kidnaped the victim while stealing his truck and ultimately drove him to a secluded area and shot him three times in the head). Three other similar cases ultimately ended in reversal of defendant's death sentence, removing them from consideration in proportionality review. See State v. Clark, 492 So.2d 862 (La.1986)(original sentence of death set aside and life imposed after reversal, defendant shot and killed an employee of Studebaker's Lounge while engaged in an armed robbery); State v. Williams, 392 So.2d 619 (La.1980) (defendant, while robbing an Exxon service station, shot and killed an employee; jury recommended death, however, sentence was reversed, and after remand, the jury recommended life); State v. Clark, 387 So.2d 1124 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981), reversed in habeas proceedings, Clark v. Louisiana State Penitentiary, 694 F.2d 75 (5th Cir.1982)(defendant stabbed and shot the night manager of the Red Lobster Restaurant to death during an armed robbery; after federal habeas corpus relief, he pled to a life sentence).