**STATE OF LOUISIANA**        \*         NO. 2022-KA-0423

**VERSUS**                    \*

                                  **COURT OF APPEAL**

**SHARRIEFF M. KENT**      \*

                                  **FOURTH CIRCUIT**

                              \*

                                  **STATE OF LOUISIANA**

                    \* \* \* \* \* \* \*

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. 21-1602, DIVISION "A"
Honorable Kevin D. Conner, Judge
\* \* \* \* \* \*
**Chief Judge Terri F. Love**
\* \* \* \* \* \*

(Court composed of Chief Judge Terri F. Love, Judge Dale N. Atkins, Judge Pro Tempore James F. McKay, III)

Charles Ballay
District Attorney
Parish of Plaquemines
Jason Napoli
Assistant District Attorney
Parish of Plaquemines
333 F. Edward Hebert Boulevard, Building 201
Belle Chasse, LA 70037

     COUNSEL FOR STATE/APPELLEE

Justin Caine Harrell
H2 LAW, LLC
1100 Poydras Street
Suite 2900
New Orleans, LA 70163

     COUNSEL FOR DEFENDANT/APPELLANT

                         **CONVICTION AND SENTENCE REVERSED**
                                                **DECEMBER 6, 2022**

Defendant, Sharrieff M. Kent, appeals his convictions on two counts of aggravated assault with a firearm, one count of aggravated criminal damage to property, and one count of illegal discharge of a firearm.

We find the State violated Defendant's right to due process in that it improperly introduced evidence of other crimes and a prior conviction, in contravention of La. C.E. art. 404(B), and violated Defendant's Fifth Amendment right to remain silent. Accordingly, we reverse Defendant's conviction and sentence.

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant was initially charged by Bill of Indictment with two counts of aggravated criminal damage to property, violations of La. R.S. 14:55, and one count of illegal use of weapons or dangerous instrumentalities, a violation of La. R.S. 14:94(A). Thereafter, in a separate Bill of Indictment, Defendant was charged with two counts of aggravated assault with a firearm, violations of La. R.S. 14:37.4. The charges in both Bills of Indictment were based on the same incident in which Defendant allegedly fired his gun at two deputies with the Plaquemines

Parish Sheriff Office. The State later consolidated all five charges and filed a Motion to Invoke Firearm Sentencing Provision. After a four-day jury trial, Defendant was found guilty as charged of two counts of aggravated assault with a firearm; one count of aggravated criminal damage to property;[1] and one count of illegal discharge of a firearm.

Post-trial, the district court denied Defendant's Motion for New Trial and granted the State's Motion to Invoke Firearm Sentencing Provision as to the two counts of aggravated assault with firearm charges and the illegal discharge of a firearm charge. Defendant was sentenced to six years on the two counts of aggravated assault with a firearm convictions; five years on the aggravated criminal damage to property conviction; and two years on the conviction for illegal discharge of a firearm, with the sentences to run concurrently.

*Trial Testimony*

**Detective Jennifer Daigle**

Detective Daigle testified that she was a sergeant in the narcotics division of the Plaquemines Parish Sheriff's Office on the date that Lieutenant Christopher Johnson and she conducted a "trash pull" at 126 Villary Street.[2] She explained that a trash pull is a "glorious name for digging in someone's trash" and is a common investigative tactic, specifically for investigative bureaus and narcotic divisions. She maintained that a trash pull is legally permissible as long as the trash can that

---

[1] Defendant was found not guilty of count three of aggravated criminal damage to property.

[2] Prior to Detective Daigle's testimony, Nataline Banks, the custodian of 911 recordings for Plaquemines Parish, authenticated a disc with recordings of several 911 calls placed to the call center starting at around midnight of June 23, 2019 and going into June 24, 2019. The disc, which reflected that callers reported shots fired on Villary Street in Plaquemines Parish, was played for the jury.

is the subject of the search is on a public servitude.[3]  In initiating this investigative tactic, she stated that agents "Google" the individual's address after they obtain a suspect's name or a description. Upon learning the address, they investigate the trash pickup schedule at the address and conduct the trash pull on the evening before the pickup.

Detective Daigle testified that while conducting trash pulls, officers "try to be discreet and try to be low key, so obviously, the dealers or the users don't find out that we're specifically investigating them."  As such, officers use unmarked vehicles, dress in dirty, dark clothing, and typically conduct trash pulls in the evening "because it's discreet, it's dark, and less people are out."  Detective Daigle relayed that during the normal work shift, the deputies obtain a list of the people they want to investigate for a trash pull. After this testimony, Defendant moved for a mistrial, alleging the State impermissibly referenced other crimes evidence.  In response, the State asserted that "[t]here's nothing alleged that [the defendant has] committed any type of crime or anything like that.  There's no bad act that's been committed."  The trial court denied Defendant's motion, ruling that the State "was entitled to provide a reason as to why they [the police officers] were out there." Referencing a pre-trial conference ruling, the trial court permitted the State to mention "trash pull with [n]arcotics." [4]  However, the judge admonished the State

---

[3] Robert Spears, the Geographic Information System ("GIS") Manager for Plaquemines Parish, testified that the area from the curb of a street, continuing nine feet toward private properties, is public property.  After being shown a photograph of the front of Defendant's address at 126 Villary Street, Mr. Spears stated that based on the photograph, the trash can was within nine feet of the public servitude.  Mr. Spears acknowledged that he did know where the trash can was positioned on the night of the incident.

[4] The trial transcript revealed comments from the trial judge which indicated that the admissibility of evidence relative to the trash pull investigation had been the subject of an in-chambers conference and a pre-trial ruling.  The trial judge noted that "I gave you guys permission when we had this conference that because of the fact, factually, the State, in my

that Defendant was not on trial for any kind of narcotics crime and that he would consider a mistrial in the event the State continued to dwell on the narcotics issue.

Upon resumption of her testimony, Detective Daigle testified that on the day of Defendant's trash pull, she and Lieutenant Johnson were travelling in Lieutenant Johnson's black F-150 pickup truck. She said the officers pulled up next to the trash can that was on the servitude at 126 Villary Street. Lieutenant Johnson stopped the truck, and Detective Daigle exited the vehicle. She said it was very dark, like looking in a black hole. Attempting to conceal herself, Detective Daigle walked alongside the vehicle. As she walked on the side of the truck, she looked into the trash can and saw a white bag. After Detective Daigle grabbed the bag, she heard an angry male scream, "Hey. Hey … What are you doing?" In response to hearing the voice, she said "I obviously heard someone who was very angry and I just thought to myself, all this effort for nothing and now he's going to know, you know, we're investigating him." Defendant objected to this testimony and moved again for a mistrial. The trial judge denied the motion, reasoning that Detective Daigle's testimony had not reached the level to declare a mistrial.

After the second mistrial motion was denied, Detective Daigle stated that after she heard Defendant yell, she threw the trash bag she had grabbed in to the back of the F-150. She yelled to Lieutenant Johnson "to go." As he pulled off, she hopped into the passenger seat and turned to see the location of the person who was following her. At that time, she saw a white flash, heard five to seven gunshots, and crawled onto the floorboard of the truck. Detective Daigle testified

---

opinion, was entitled to provide a reason as to why they were out there. And I indicated to you that the trash pull with [n]arcotics, if it was just generally stated that's the reason for the trash pull, you leave it at that and you don't dwell on it and keep focusing on that." Both the State and Defendant mentioned the pre-trial ruling in briefs. However, the appellate record contains no transcript of the conference and the in-chambers conference does not appear in a minute entry.

that at the time of the gunfire, Lieutenant Johnson's vehicle was two to three houses past Defendant's residence. She said that one shot hit the rear passenger tire. Detective Daigle asserted that she was not armed on that evening and that she did not reach for her waistband.

On cross-examination, Detective Daigle acknowledged that she could certainly "understand why someone would be concerned about an individual on or near their property concealing themselves in dirty, dark clothes with gloves on in the middle of the night." She verified that she was not in a police uniform, did not wear a visible badge, was in an unmarked vehicle that did not display any lights, and never announced herself as a law enforcement officer to Defendant. She described the area as being dark, like a black hole. Detective Daigle reiterated that the only bullet hole to the vehicle was to the bottom rear passenger tire. She confirmed that she did not ever see any narcotics at 126 Villary Street.

**Lieutenant Christopher Johnson**

Lieutenant Johnson confirmed that he participated in the trash pull at Defendant's house with Detective Daigle. Lieutenant Johnson testified that photographs of 126 Villary Street depicted a brown spot in the grass about a foot from the curb, indicating that the trash can had been left in the same place for a period of time. Lieutenant Johnson verified that the trash can was about a foot from the curb when Detective Daigle and he arrived. Lieutenant Johnson heard Detective Daigle open the lid of the trash can, and then he heard a loud, angry male voice scream, "Hey. Hey, … What are y'all doing?" At this point, Lieutenant Johnson said Detective Daigle screamed for them to go. Lieutenant Johnson explained that he did not get out of the truck and identify himself to Defendant because, based on his twenty years of law enforcement, he did not believe that the

5

man's anger would quickly dissipate. Rather, he believed that driving away would deescalate the situation. As he drove away, about six shots were fired when he was two to three residences from 126 Villary Street. He testified that Detective Daigle was not armed, and it would have been extremely dangerous for her to have reached for her waistband. Lieutenant Johnson added that neither he nor Detective Daigle entered Defendant's private property and that they made no threatening gesture towards Defendant.

### Chief Deputy Lon Boudreaux

Chief Deputy Boudreaux testified that on the evening of the incident, he was advised that two narcotics deputies had come under fire while conducting a trash pull. He was also informed that the suspected shooter had retreated into the home at 126 Villary Street, was barricaded inside, and was not coming out. Chief Deputy Boudreaux said Defendant left the house about an hour after a Swat Team had been set up around Villary Street. Chief Deputy Boudreaux was present when Defendant was administered *Miranda* warnings[5] and placed under arrest by Lieutenant John McDaniel. He testified that Defendant asked why he was being placed under arrest. When Defendant was told that he was under investigation for illegal discharge of a firearm, Defendant stated, "I shot at the black F-150. I have a right to protect my property. They were stealing my garbage." Chief Deputy

---

[5] *See Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed. 2d 694 (1966), in which the Court outlined the warnings a person subject to police interrogation must receive as follows:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.

Boudreaux said Defendant's statement was unsolicited. Defendant was arrested after he made the statement. Chief Deputy Boudreaux secured Defendant's house when Defendant and his fiancée advised that there were children in the house and Defendant admitted that there were weapons in the house. Chief Deputy Boudreaux said that a search of the house uncovered ammunition, two long guns, a handgun, a .22 rifle, and a crack barrel shotgun.

On cross-examination, Chief Deputy Boudreaux testified that none of the firearms located in the house were possessed illegally. He also stated that there was never a stand-off in which Defendant had barricaded himself in his home.

On re-direct examination, Chief Deputy Boudreaux testified that Defendant was given the opportunity to give a full recorded statement. However, Defendant did not provide a statement and invoked his right to remain silent.

**Lieutenant John McDaniel**

Lieutenant McDaniel testified that he responded to a radio call from Detective Daigle. In the call, Detective Daigle said that she was being fired upon and needed assistance. Lieutenant McDaniel advised that he handcuffed and arrested Defendant after Defendant came out of his Villary Street house. When Defendant asked why he was being handcuffed, Lieutenant McDaniel immediately *Mirandized* him. Lieutenant McDaniel relayed that Defendant acknowledged that he understood his rights and said, "I shot at a black F-150. I have a right to protect my property. They were stealing my garbage."

**Detective Brett Taylor**

Detective Taylor, the lead detective on the case, testified that he was notified of a shooting and told to go to the scene. He stated that he collected .40 caliber shell casings from the public servitude, and that photographs were taken of the

7

casings and skid marks from bullets coming off the street. The casings were submitted for ballistics testing. Detective Taylor testified that the shots fired hit the F-150's right rear tire, a fence, and a neighboring house. Detective Taylor testified that no one questioned Defendant prior to the time he was handcuffed. However, after Defendant was advised of his rights, Defendant stated, "I shot at that black F-150. They were stealing my garbage. I have a right to defend my property." Detective Taylor asserted that Defendant had an opportunity to provide a written or recorded statement; however, Defendant was not willing to provide a statement. Detective Taylor also testified that Defendant never told Detective Taylor that he would provide a statement if his lawyer was present. The defense objected to this testimony and moved for a mistrial, arguing that the questions relative to Defendant's willingness to give a statement went to Defendant's right to exercise his Fifth Amendment right to remain silent. The trial court overruled the objection, finding the State's questions were proper in that they only concerned Defendant's opportunity to give a statement.

### Lieutenant Curt Johnson

Lieutenant Johnson testified that he participated in the search of Defendant's residence. The search led to the discovery of an AK-47 style rifle and multiple magazines, an AR-15 in a rifle case, a shotgun, a .22 caliber long rifle, and a .40 caliber handgun. A second .40 caliber firearm was found in one of Defendant's vehicles. Lieutenant Johnson noted that the only weapon that was used in the incident was the .40 caliber handgun found in Defendant's bedroom.

### Emily Terrebonne

Ms. Terrebonne, who was qualified as an expert in the field of firearms and tool mark identification, authored the ballistics report which was entered into

evidence. Ms. Terrebonne tested both .40 caliber handguns recovered and compared them to the shell casings that were found on the scene. All four shell casings collected from the scene matched one of the .40 caliber handguns.

**Defendant Sharreiff M. Kent**

Defendant testified that he lived at 126 Villary Street with his children and his fiancée. He stated that about a year and a half before the arrest incident, his house was burglarized while the family was on vacation. On the evening of the trash pull, he said that he returned home just before midnight. The street was very dark, and he pulled into the driveway and sat in his car "playing" on his cellphone. While still in the car, he saw a dark truck pull up between his property and the neighbor's property on the right. The truck's lights were out. Defendant said he suspected that similar to the earlier event, someone may have thought he was out of town and was attempting to break into his house. Defendant testified that he saw a person exit the vehicle. The individual was wearing dark clothing, boots and gloves and was ducking down as if trying to hide, "like a criminal would do." When the person arrived at the fence line of Defendant's property, Defendant shouted, "hey, what are you doing?" The individual, who Defendant believed was male, did not respond, but rather ducked and reached for something in his waistband. Defendant said that he was afraid and knew he had to stop this person from entering his house. Thinking the person had a gun, Defendant fired his gun. Defendant said "[t]he person turned and started going in the direction of the truck as if they're going to grab something out." Defendant testified that he had to "think really fast and very quick because I don't know if they … if there's something big in that – Anything that basically can stop me." He averred that "[i]f they stop me, then I know my family don't [sic] have a chance." Defendant

9

further testified that the individual was approaching his fence line area when he fired, and that the trash can was not on the curb; instead, it was on his private property. He testified that only a dirty diaper and a food takeout container were in the trash can. The defense introduced into evidence a photograph of the trash can to corroborate its contents.

Defendant said that he still suffered from anxiety "for having had to fire [his] weapon at someone." He testified that this incident was the first time he had to fire his gun; he only fired it at the shooting range. He believed that he fired about six shots. He testified that when he fired the first shot, the vehicle was in the same spot as it was when it had pulled up, and the individual who exited the vehicle was about five feet away from him. As he fired the weapon, the individual ran back to the truck, and the truck spun out and drove away. He denied that he fired at the truck as it was going down the street. He watched the vehicle go down the street and then ran into the house and checked on his family. He claimed he did not call police because he was afraid. His fiancée woke up, and he tried to explain to her what had happened. While his fiancée and he were talking, she received a phone call from her father. Her father told her that the police said that "your husband need to come outside. The house is surrounded." He said that prior to that phone call, no one had contacted Defendant to get him to leave his house. After the phone call, Defendant exited the house. As soon as he opened the door, he saw at least fifty officers with AR-15s pointed at him. The officers ordered Defendant and his fiancée to the ground; they both laid on the pavement in the middle of the street. He was then handcuffed and placed on the curb. Defendant said he asked why he was being arrested, and the police chief answered the arrest was for illegal discharge of a firearm. Defendant denied that he made the

10

statement that "I know my rights. I have the right to protect my property. They were stealing my garbage." Defendant asserted that he fired his weapon to protect his family "because they was [sic] coming up my property line." Defendant testified that the officers asked him to give a statement after he had been charged. His response was that "I'm not speaking without an attorney present."

On cross-examination, Defendant answered "[t]hat's also correct" to the State's question that "you never bring your guns out unless you go to the gun range, right?" The State then asked Defendant to "[t]ell the jury about the time he pulled a gun on Deputy Joey Rees with the Sheriff's Office and was convicted of Interfering with a Police Investigation." The defense moved for a mistrial. The trial court denied the motion, reasoning in part, that it was not convinced that the State's cross-examination of Defendant relative to the facts of the previous conviction was clearly prejudicial. When the State's cross-examination resumed, Defendant denied there was a 2017 incident in which he drew his weapon on Deputy Rees with the Plaquemines Parish Sheriff's Office and denied that he heard the officer say numerous times that "I'm with the Sheriff's Office. Place your firearm down." Defendant maintained that he complied with the officer once he found out that he was with the Sheriff's Office. The State then asked why was Defendant convicted of Interfering with a Police Investigation if Defendant had complied and acted within reason. In response, the defense again moved for a mistrial, which the trial court denied. The trial court stated that it would allow the State to ask about the actual 2017 conviction. Defendant admitted that he was convicted of Interfering with a Police Investigation. However, he denied that the basis for the conviction was a result of drawing his firearm on a police officer.

11

On redirect examination, Defendant maintained that he never saw Detective Daigle look in his trash can. Further, he testified that he did not leave his trash can on the curb; rather, the trash can was within his property line. Defendant stated that Detective Daigle was facing Defendant, approximately five feet away, at the time he fired. He alleged that she was on his property at the time, "almost mid-point of the yard." Defendant said he fired multiple shots at the truck; however, he missed. Defendant maintained that he did not make a statement after he was *Mirandized*.

## ERRORS PATENT

A review of the appellate record reveals no errors patent.

## DISCUSSION

Defendant raises four assignments of error. He contends that (1) his due process rights were violated when the trial court admitted evidence of an unadjudicated criminal narcotics investigation; (2) his due process rights were violated when the trial court admitted facts pertinent to Defendant's prior misdemeanor conviction; (3) his Fifth Amendment rights were violated by the State's reference to his post-arrest, post-*Miranda* silence; and (4) the trial court abused its discretion by failing to grant the motion for a new trial.

### Assignment of Error Number 1: Due Process Violation/ Evidence of Criminal Narcotics Investigation

In Defendant's first assigned error, he complains that his due process rights were violated because the trial court permitted the State's witnesses to repeatedly testify that he was the target of a criminal narcotics investigation. Defendant specifically cites Detective Daigle's testimony wherein she testified that she was a narcotics agent; referenced the use of trash pulls as an investigative tactic in

narcotics investigations; and her assertion that her investigation was compromised because Defendant knew he was under investigation after he saw Detective Daigle near his trash can. Defendant argues that the admission of this testimony highlighted that he was under investigation for a narcotics violation at the time of his arrest and depicted him as a criminal and gave the impression that the shooting was likely motivated to protect his "felonious enterprise," all in contravention of Louisana Code of Evidence art. 404(B)(1). That article provides the following:

> B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

In general, the article excludes evidence of other crimes, or bad acts committed by a defendant at trial due to the risk of grave prejudice to the defendant. *See State v. Prieur*, 277 So.2d 126, 128 (La. 1973). The *Prieur* Court reasoned that "[t]he probative value of evidence of unrelated offenses in relation to the charged offense should therefore be weighed in light of its possible prejudicial effect, its tendency to influence the triers of fact improperly as to the [current] guilt of the accused."[6] *Id. See also State v. Kahey*, 436 So.2d 475, 487 (La. 1983) ("The introduction of such evidence merely to prove that the defendant is a 'bad man' involves constitutional problems because of the danger that a defendant may be tried for a

---

[6] The Louisiana Supreme Court abrogated *Prieur* on other grounds in *State v. Taylor*, 2016-1124, p. 10 (La. 12/1/16), 217 So.3d 283, 291 ('when seeking to introduce evidence pursuant to La. C.E. art. 404(B), the state need only make a showing of *sufficient* evidence to support a finding that the defendant committed the other crime, wrong, or act).

charge of which he has no notice, for which he is unprepared, and which unfairly prejudices him in the eyes of the jury.").

However, evidence of other crimes may be introduced if the evidence is independently relevant or when it relates to conduct that "constitutes an integral part of the act or transaction that is the subject of the present proceeding," formerly referred to as *res gestae*. *See* La. C.E. art. 404(B)(1); *State v. Norah*, 2012–1194, p. 27 (La. App. 4 Cir. 12/11/13), 131 So.3d 172, 190. "*Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them." *State v. Taylor*, 2001-1638, p. 10 (La. 1/14/03), 838 So.2d 729, 741. Using *res gestae*, the State completes "the story of the crime on trial by proving its immediate context of happenings near in time and place." *Id.*, 2001-1638, p. 11, 838 So.2d at 742.

In this case, the defense twice requested a mistrial during Detective Daigle's testimony. Defendant's first request for a mistrial came after Detective Daigle made repeated references to her status as a narcotics officer, described in detail the mechanics of a trash pull as an investigative tactic for narcotic offenses, delineated the process by which a suspect is identified for purposes of a trash pull investigation, and emphasized that trash pull investigations are discreet so "the dealers or the users don't find out that we are specifically investigating them." In an apparent application of the *res gestae* doctrine, the trial court denied the motion for mistrial. The trial court determined that the State was "entitled to provide a reason as to why they were out there" and permitted the State to elicit general testimony about the trash pull investigation "with Narcotics." However, the trial

court cautioned the State that it had placed limits on that testimony, opining as

follows:

**THE COURT:**

> Yes. The thing of it is, Mr. Napoli, is the focus here. He's not on trial for any type of Narcotics violation. Period. And I don't like the fact that you guys keep dwelling on the issue with narcotics and go through the whole history and go through the whole history, "How do you do Narc - - blah, blah, blah, blah, blah[.]" That's all irrelevant because this isn't a narcotics case.
>
> The fact that you've established the pull, I allowed that. The fact of how the pull is used - - is constantly used as doing that. But I think it's time to move on. Okay? And I don't want the jury to be painted a picture that this guy's a bad guy and is being investigated for something that there's absolutely no evidence is going to be entered into the record that he's involved in any way, shape, whatsoever with narcotics.
>
> So the only reason I let you in was to explain what they were doing, why they were there. But we don't need to get a whole history of everything to do with the Narcotics Squad. Okay?

Defendant argues that its second request for a mistrial should have been

granted based on Detective Daigle's testimony after her examination resumed.

Defendant asserts that Detective Daigle's testimony that "all this effort for nothing

and now he's going to know, you know that we're investigating him" continued

the State's improper focus on the fact that Defendant was the subject of a criminal

narcotics investigation, notwithstanding the trial court's admonition. We agree.

Even when bad acts and other crimes evidence is offered for an otherwise

admissible purpose, the trial court must still balance the probative value of the

evidence before the evidence can be permitted. *See* La. C.E. art. 403.[7]   As

discussed in *Prieur*, 277 So.2d at 128-29, the purpose of the prohibition against the

---

[7] La. C.E. art. 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay or waste of time."

admissibility of character and other acts of misconduct evidence is to negate the possibility that a jury might be improperly influenced to convict a defendant of the current offense as result of its perception of defendant as a bad man based on the prior bad act. In the matter *sub judice*, when we balance the admissibility of evidence under the *res gestae doctrine* against the purpose behind excluding bad acts and other crimes evidence, Detective Daigle's testimony went beyond the need to explain the officers' presence on the scene to conduct the trash pull investigation; and instead, prejudiced Defendant with his depiction as a drug offender. The trial court allowed the State to give detailed and repetitive testimony about trash pull investigations to justify the officers' presence on the scene. This excessive focus to explain the officers' presence was unwarranted as the officers were not on trial for any offense; and moreover, the explanation of their presence and the repeated references that Defendant was the subject of the trash pull 'narcotics" investigation were not probative of Defendant's guilt on the present charges.

An appellate court will not disturb a trial court's ruling on the admissibility of other crimes evidence absent an abuse of discretion. *See State v. Hickerson*, 2019-1077, p. 22 (La. App. 4 Cir. 12/30/20), 312 So. 3d 1124, 1140. Upon review, Detective Daigle's testimony, which needlessly emphasized that Defendant was the subject of a criminal narcotics investigation, was more prejudicial than probative. Accordingly, we find the trial court abused its discretion in allowing the testimony to be admitted into evidence.

***Assignment of Error Number 2: Prior Misdemeanor Conviction /Due Process Violation***

Defendant complains in his second assignment of error that "[t]he State violated [his] due process right by improperly impeaching [him] regarding a prior misdemeanor conviction and using the opportunity to introduce unsubstantiated and uncorroborated extrinsic 'evidence.'"  This alleged error arises out of the State's introduction of Defendant's prior 2017 misdemeanor conviction for Interfering with a Police Investigation.

Defendant maintains that the State introduced the prior conviction without giving reasonable notice as required by La. C.E. art. 404(B)(1), improperly used the prior conviction for impeachment purposes, and exceeded the scope of the parameters fixed by La. C.E. art. 609.1 to examine witnesses regarding prior convictions.  As discussed below, upon review of Defendant's direct and cross-examination testimony, Defendant's arguments have merit.

<u>Impeachment</u>

The parties do not dispute that the State gave no notice of its intent to use Defendant's prior conviction. However, the State contends that pursuant to La. C.E. art. 607(C), [8] it did not have to provide notice because it was permitted to introduce Defendant's prior conviction to impeach Defendant's testimony that he only brought out his guns at the gun range.

Defendant's testimony regarding the use of his guns was addressed in the following testimony:

**DIRECT EXAMINATION BY MR. CARTER:**

Q.     Now, Mr. Kent, I can't speak for the jury but me, myself, I've never had to fire a weapon at someone.  Can you explain to us the

---

[8] La. C.E. art. 607(C) states that "[e]xcept as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony."

17

feeling you had? Were you afraid, were you excited to do it? Like, what were you feeling in that moment?

A.    Even now, two years later, I'm still suffering from anxiety. I have never fired my weapon at anybody. That was the first time I had to use my gun. I only use it at the shooting range. So at the time, very nervous, shaky, frantic, static. Like, talking about it right now is making me feel uncomfortable. It -- It just -- It does something to you. It had me all over the place. Took me a while to just calm down and grasp reality.

The following exchange took place on the State's cross-examination of Defendant as to when Defendant "brought out" his guns:

**CROSS-EXAMINATION BY MR. NAPOLI:**

Q.    Mr. Kent, one of the things you said is that you suffer from great anxiety because you had to use your firearm in this incident, is that correct?

A.    That's correct.

Q.    All right. You said you never bring your guns out unless you go to the gun range, right?

A.    That's also correct.

Q.    Okay. So the only time - - You have your guns in your house, and the only times you've ever brought them out is when you go to the gun range, practice shooting?

A.    If I'm going out late hours I have my handgun on me, yes.

Q.    Okay. Tell the jury about the time you pulled a gun on Deputy Joey Rees with the Sheriff's Office and was convicted of Interfering with a Police Investigation.

**MR. CARTER**:

        Objection.

**CROSS-EXAMINATION BY MR. NAPOLI:**

Q.    Tell the jury about the time you pulled the gun out that time.

**MR. CARTER**:

        Object. Move for mistrial and I'd ask to approach.

18

Although the State asserts that it introduced the prior conviction to impeach Defendant's testimony that he only brings out his guns at the gun range, close scrutiny of Defendant's testimony finds no documentation of this specific assertion on direct examination. As referenced hereinabove, on direct examination, Defendant was asked by his counsel to describe the feelings he experienced in the moment when he had to fire his weapon at someone. In response, Defendant testified that he had never *fired* his gun at anybody before and "[t]hat was the first time I had to use my gun. I only use it at the shooting range." Taken in its context, Defendant's direct testimony expressed that he suffered anxiety because, outside of his firing his gun during the incident herein, he had only fired or used his gun at the shooting range.

As to Defendant's testimony on cross-examination, the record supports that Defendant responded "[t]hat's also correct" to an assertion posed by the State that "[y]ou said you never bring your guns out unless you go the gun range, right?"[9] However, Defendant also added that "[i]f I'm going out late hours I have my gun on me." In this testimony, Defendant clearly established that he brought out his guns not only when he was at the gun range, but also when he went out late at night. Accordingly, upon reviewing Defendant's testimony in context and its totality, this Court finds Defendant made no inconsistent statement regarding "bringing out his guns" to permit the State to introduce his prior conviction to his attack his credibility or truthfulness on that issue.

---

[9] Although Defendant answered "[t]hat's also correct" to the State's question that he never brought out his guns unless he was at the gun range, we reiterate that our review of the record finds no testimony by Defendant on direct examination wherein he expressly testified that "[I] never bring [my] guns out unless [I] go to the gun range." Thus, the State mischaracterized Defendant's direct testimony in formulating its question to Defendant on cross-examination.

19

La. C.E. art. 609.1

Notwithstanding that the State did not have grounds to use Defendant's prior conviction for impeachment purposes, the State properly represents that it also was entitled to cross-examine Defendant as to his prior conviction in accordance with La. C.E. art. 609.1, which permits a witness who testifies to be examined regarding his prior convictions. Therefore, when Defendant testified as a witness in this matter, Defendant subjected himself to cross-examination on his criminal conviction. Defendant counters that although art. 609.1(A) allows a witness to be examined as to his criminal conviction, art. 609.1(C) places limits on that examination which the State exceeded.

The framework to examine a witness regarding his criminal convictions is outlined in La. C.E. art. 609.1 as follows:

**A. General criminal rule.** In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.

**B. Convictions.** Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.

**C. Details of convictions.** Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. However, details of the offense may become admissible to show the true nature of the offense:

(1) When the witness has denied the conviction or denied recollection thereof;

(2) When the witness has testified to exculpatory facts or circumstances surrounding the conviction; or

(3) When the probative value thereof outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury.

Defendant specifies that the State exceeded the parameters of La. C.E. art. 609.1(C) in that the article provides that ordinarily, only the fact of the conviction, the name of the offense, the date of the offense, and the sentence imposed are admissible; and permits the details of the conviction to be admitted when Defendant denies the conviction or when the probative value outweighs the danger of unfair prejudice. Upon reviewing the State's cross-examination of Defendant regarding his prior 2017 conviction, we agree with Defendant that the State failed to meet the prerequisites to cross-examine Defendant on the underlying details of Defendant's prior conviction.

The State's cross-examination of Defendant in regards to his prior conviction included the following:

Q. Mr. Kent, in 2017, did you draw your firearm on Deputy Rees with the Plaquemines Parish Sheriff's Office?

A. No.

Q. You didn't?

**MR. CARTER:**

Asked and answered.

**CROSS-EXAMINATION BY MR. NAPOLI**

Q. It's your testimony that in 2017, there was not an incident where you drew your weapon on a member of the Sheriff's Office?

A. No, it isn't.

Q. Okay. You recall an incident when a Sheriff's deputy came to your property conducting an investigation and you came out with a gun?

A. No, it didn't happen that way.

Q.     Didn't happen that way?  Do you recall the deputy telling you numerous times, while in uniform, "Put your gun down.  Put your gun down," and you refused?

A.     It was late at night, dark as is the night of this last incident.  And I had people in my backyard about one o'clock in the morning.  My dogs woke me up with a loud barking.  I have about five dogs and they all barked very loud, very vicious.  I woke up out of my bed, put on a robe.  I grabbed my firearm and I looked out my patio door.

Q.     And when you went outside you saw Deputy Rees in uniform and you were armed with a firearm, correct?

A.     I never went outside.

Q.     Did you open the door?

A.     I opened it, yes.

Q.     And Deputy Rees, in full uniform told you numerous times to put down your firearm, correct?

A.     Deputy Rees wasn't identified at the time.

Q.     What was he wearing?
A.     It was black, so I couldn't see anything, so I - -

Q.     Oh, so it's your - -

A.     - - asked him to come to the front of my house so I can identify him as a police officer.

Q.     He said numerous times, "I'm with the Plaquemines Parish - -

**MR. CARTER:**

     Objection.
. . . .

**CROSS-EXAMINATION BY MR. NAPOLI**

Q.     Mr. Kent, is it your testimony that you didn't hear the officer saying numerous times "I'm with the Sheriff's Office.  [Please] place your firearm down?

A.     That's my testimony.  No, I did not hear the officer.

Q.    Okay.  So you had no idea that was a Sheriff's Officer who was demanding numerous times for you to put your firearm down.  That's your testimony?

A.    I found out that he was a Sheriff's officer when I asked him to come to the front of the house and identify hisself [sic] properly and leave the backyard so that I can know who he is.  After that point, he took a flashlight and flashed it on his body illuminating hisself [sic] because like I said, it's really dark.  Illuminating his badge, his uniform, his gun, and then he asked me, "Now, can you see that I'm an officer?"  "Yes, I can."  And then after that point, I complied.

Q.    Okay.  And Mr. Kent, if you complied and acted completely within reason, why were you convicted - -

**MR. CARTER:**

Objection.

**CROSS-EXAMINATION BY MR. NAPOLI**

Q.    - - of interfering with a Police Investigation?

**MR. CARTER:**

Objection. Objection. I would move for a mistrial again.

Defendant's motion for a mistrial was denied, and the State resumed its cross-examination as follows:

**CROSS-EXAMINATION BY MR. NAPOLI:**

Q.    You were convicted of Interfering with a Police Investigation based on your drawing that firearm, correct?

A.    That's incorrect?

Q.    You weren't convicted of Interfering with a - -

**MR. CARTER:**

Asked and answered.

. . . .

**CROSS-EXAMINATION BY MR. NAPOLI**

Q.    Mr. Kent, so is it your testimony you were not convicted of Interfering with a Police Investigation?

A.     Yes, of a Police Investigation, not of a firearm.

Q.     So you were convicted of that, correct?

A.     Which one?

Q.     Of Interfering with a Police Investigation - -

A.     Yes.

Q.     Based on that interaction with Joey Rees, correct?

A.     No.

Q.     Oh, what was it based on, then?

A.     It was based on the dispute we had.  Me identifying him as a police officer.

Q.     And in the end, you ended up convicted of a crime for that dispute, correct?

**MR. CARTER:**

Objection.  Asked and answered.

**THE COURT:**

Yes.  Sustained.  He - - He had already admitted he was convicted.

With regards to details of the prior conviction, La. C.E. art. 609.1(C) provides that ordinarily, only the fact, name, and date, and sentence imposed are admissible.  Underlying details of the offense are allowed under certain conditions, including when the witness has denied the conviction or when the probative value outweighs the danger of unfair prejudice and the risk of confusing or misleading the jury.  *See* La. CE. art. 609.1(C)(1) and (C)(3).[10]  Upon reviewing the State's cross-examination of Defendant in the instant matter, we find the State did not

---

[10] As previously referenced, details of the witness' prior offense may be also be offered under La. C.E. art. 609.1(C)(2), "[w]hen the witness has testified to exculpatory facts or circumstances surrounding the conviction."  However, that exception does not apply to the facts of the present matter.

meet any of the conditions to examine Defendant as to the underlying details of his prior conviction.

We first note that in contravention to La. C.E. art. 609.1(C), which ordinarily limits examination as to the details of a conviction to the fact of the conviction and the name, date, and sentence imposed, the trial court improperly permitted the State to cross-examine Defendant as to the underlying details behind the conviction before Defendant was asked to admit or deny the admissible details permitted by art. 6091(C). When directly asked near the end of the State's cross-examination, Defendant admitted that he had been convicted of the prior offense— Interfering with a Police Investigation.

The failure to allow Defendant to first admit or deny the admissible details of a conviction as allowed by La. C.E. art. 609.1(C) was exacerbated by the fact that the trial court allowed the State to cross-examine Defendant on the State's version of the details surrounding the prior conviction, namely, that Defendant's conviction of the prior offense resulted because Defendant pulled his gun on a deputy sheriff was the underlying reason for the conviction, without requiring the State to offer any evidence in support of the State's version. Specifically, the State did not offer any testimony from the officer involved in the prior conviction, testimony from any other witness, and any supporting documentary evidence.

Thus, we conclude that the sequence of the State's cross-examination of Defendant regarding the details of the prior conviction was improper. The trial court not only impermissibly allowed the State to question Defendant about unsubstantiated, unsworn details of the prior conviction, but also one of the grounds permitted by La. C.E. art. 609.1(C)(1) to examine Defendant about the

25

underlying details of his prior conviction—denial of the conviction—would have been eliminated had Defendant been allowed to first admit to the prior conviction.

The underlying details of a criminal conviction may also be introduced into evidence when the probative value outweighs the danger of unfair prejudice to a defendant or the risk of confusing or misleading a jury. *See* La. C.E. art. 609.1(C)(3). The State, however, also did not meet those grounds in this matter. The State's version of the details of Defendant's prior conviction for Interfering with a Police Investigation was not probative of any facts regarding the present charges. The facts of the present case are clearly distinguishable. Notably, unlike the prior conviction, in the present matter, it is undisputed that the officers never identified themselves as officers at any point during the incident in which Defendant discharged his weapon. Detective Daigle's and Lieutenant Johnson's testimony established that they intentionally concealed their identities as law enforcement; moreover, the State did not offer evidence that Defendant purposefully fired at known police officers. Hence, the State's cross-examination of Defendant regarding the prior conviction was unduly prejudicial in that it permitted the State to depict Defendant to the jury as someone who had a history of drawing his weapon on law enforcement without cause.

Based on the foregoing, the trial court erred in allowing the State to cross-examine Defendant on the underlying details of his prior conviction.

### *Assignment of Error Number 3*: *Fifth Amendment Violation*

In his third assignment of error, Defendant contends that his Fifth Amendment rights were violated by the State's reference to his post-arrest, post-*Miranda* silence. Defendant cites the following testimony as improper references: (1) the testimony of Chief Deputy Boudreaux wherein the State questioned the

26

Chief Deputy as to whether Defendant was given an opportunity to prepare a recorded or written statement; (2) the testimony of Lieutenant McDaniel who reiterated that Defendant's statement about shooting at a black F-150 was never recorded or reduced to writing; and (3) Detective Brett Taylor's testimony that Defendant was not willing to give him a written statement and that Defendant did not say that he would give a statement if his lawyer was present. Defendant asserts that these references to his silence were impermissible regardless as to whether they were intended to implicate his guilty mind or refute his version of the facts. In support of his position, Defendant cites *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240 (1976).

In *Doyle*, the prosecution contended that questions relative to the defendants' silence were used only to impeach their testimony as to the circumstances leading to their arrests; however, the Court agreed with the defendants' claim that their due process rights had been violated by these references, holding that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.*, 426 U.S. at 619, 96 S.Ct. at 2245.

Our review of the trial record herein reveals that the State's examination of its witnesses not only concerned Defendant's opportunity to provide a statement, but also focused on Defendant's willingness to give a recorded or written statement. In particular, the State's questioning of Chief Deputy Boudreaux and Detective Taylor about Defendant's unwillingness to provide a statement improperly referenced Defendant's Fifth Amendment right to remain silent. In

Chief Deputy Boudreaux directly verified that Defendant invoked his right to remain silent in response to the State's questioning. As such, the State's questions fall within the purview of *Doyle*. The questions should not have been asked as they violated Defendant's Fifth Amendment right against self-incrimination and to remain silent.

## Harmless Error

Notwithstanding the errors cited herein, our jurisprudence holds that trial court errors are not necessarily fatal unless the defendant can demonstrate prejudice. *Hickerson*, 2019-1077, p. 21, 312 So.3d at 1139. *Hickerson* recognized that the Louisiana Supreme Court has adopted the "harmless error" test established by the United States Supreme Court in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967), which "asks whether there is a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction and requires that the reviewing court be able to declare a belief that the error was harmless beyond a reasonable doubt." *Id.*, 2019-1077, p. 21, 312 So.3d at 1139-40. *See also State v. Johnson*, 1994-1379, pp. 14-18 (La. 11/27/95), 664 So. 2d 94, 100-02 (errors leading to improper admission of evidence subject to harmless-error analysis; error harmless if verdict "surely unattributable" to error)(quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S. Ct. 2078, 2081, 124 L. Ed. 2d 182 (1993)). The State has the burden of proof to prove harmless error. *Hickerson*, 2019-1077, p. 21, 312 So.3d at 1140). In considering the evidence admitted at trial in the case *sub judice*, the State did not meet its burden of proof.

The State's introduction of bad acts and other crimes evidence ordinarily excluded by La. C.E. art. 404 painted Defendant as a "bad guy." The State's

excessive emphasis on Defendant as the subject of a criminal narcotics investigation defined him as a possible drug user or dealer. The State's introduction of Defendant's prior misdemeanor conviction for Interfering with a Police Investigation allowed the State to characterize Defendant as someone who was hostile to law enforcement and had a history of using his weapon against law enforcement without cause. Defendant's alleged bad guy persona and general uncooperative interaction with law enforcement was further underscored by the State's improper reference that Defendant had refused to provide a statement to the officers on the scene and had invoked his Fifth Amendment right to remain silent.

The State reliance on these errors in its closing argument underscores that these errors may have misled or confused the jury. The State magnified its personification of Defendant as a bad guy in stressing the dangers faced by the "good guy" police officers in performing their jobs, arguing "[b]ut what they [police officers] do expect is when they put their life [sic] on the line and someone tries to take that life, that the citizens of this parish hold that individual accountable." In comparison, the State specifically argued that the "bad guy" Defendant drew his gun on another officer in 2017 and proclaimed that Defendant "tried to kill those officers" in reference to the present charges. These arguments were made notwithstanding that the State offered no evidence that Defendant knowingly fired at police officers in the present offense or to corroborate that Defendant's prior conviction resulted from having drawn his weapon on an officer. Moreover, the State's closing argument highlighted that Defendant had invoked his Fifth Amendment right to remain silent by emphasizing that Defendant was given an opportunity to give a recorded statement and refused to do so.

As noted in *Johnson*, 1994-1379, p. 18, 664 So.2d at 102, in determining whether an error was harmless, a reviewing court must decide whether the verdict rendered was "surely unattributable" to the error. We find that the State's errors regarding the introduction of other bad acts evidence, Defendant's prior conviction, and its improper focus on Defendant's his Fifth Amendment right to remain silent were prejudicial. The State did not meet its burden of proof to show that the errors were harmless. A reasonable possibility exists that the erroneously admitted evidence contributed to the guilty verdict; and as the reviewing court, we cannot declare that the errors were harmless beyond a reasonable doubt. Accordingly, Defendant's conviction and sentence imposed are reversed.

### Assignment of Error Number 4: Denial of Motion for New Trial

Having determined that the State violated Defendant's due process rights by the introduction of other bad acts and crimes evidence and violated Defendant's Fifth Amendment right to remain silent, we pretermit discussion of Defendant's remaining claim that the trial erred in denying Defendant's motion for new trial.

### DECREE

Based on the foregoing reasons, we reverse Defendant's conviction and sentence.

**CONVICTION AND SENTENCE REVERSED**